37 A.3d 987

Bryson MURRAY, et al.

v.

TRANSCARE MARYLAND, INC., et al.

No. 1791, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Feb. 9, 2012.

174

Stephen L. Snyder (Michael B. Snyder, Jesse E. Cox, Snyder & Snyder, on the brief), Baltimore, MD, for Appellant.

Robert W. Goodson (Kathleen H. Warin, Christine M. Costantino, Wilson, Elser, Moskowitz, Edleman & Dicker, LLP, on the brief), Washington, DC, for Appellee.

Panel: KEHOE, WATTS, and MELANIE SHAW–GETER, (Specially Assigned) JJ.

WATTS, J.

This appeal arises from the grant of a motion to transfer by the Circuit Court for Baltimore City and of summary judgment by the Circuit Court for Talbot County in favor of

appellees, TransCare Maryland, Inc. and TransCare, Inc.,[1] against appellants, Karen Murray and Bryson Murray.[2] Karen filed a negligence/medical malpractice action in the Circuit Court for Baltimore City on behalf of her minor child, Bryson, for injuries sustained by Bryson during a medical aircraft transfer, and on her own behalf, a claim for loss of parental relationship and extraordinary costs and expenses. The Circuit Court for Baltimore City granted appellees' motion to transfer to the Circuit Court for Talbot County on the grounds of *forum non conveniens,* where summary judgment was granted in favor of appellees. Appellants raise three issues on appeal, which we quote as follows:

I. Did the trial court abuse its discretion in transferring this action under the doctrine of *Forum Non Conveniens* from Baltimore City to Talbot County, when the trial court (1) failed to properly regard the appellants' choice of forum, and (2) the convenience of the parties and witnesses and the interests of justice did not weigh strongly in favor of the appellees[ ]?

II. Did the trial court err when it granted summary judgment for appellees[ ] when (1) there is a genuine dispute of material fact regarding whether the assistance or medical care provided by the appellees' employee, Chris Barbour, was provided without fee or compensation, (2) CJP § 5–603 (Good Samaritan [Act]) does not apply to a private, for-profit ambulance transportation company,[3] and (3) the trial court's decision was legally incorrect?

---

1. In their briefs, both parties refer to TransCare, Inc. as TransCare Corporation. TransCare Inc. is described as the parent company to subsidiary, TransCare Maryland, Inc.

2. Due to the common surname of appellants, we will refer to the parties by their first names.

3. The circuit court and appellants refer to appellees as for-profit, private ambulance companies and for consistency throughout this opinion, we will refer to appellees as private commercial ambulance companies.

III. Did the trial court err when it granted summary judgment for appellees[ ] and determined that the appellees[ ] were a fire or rescue company within the meaning of CJP § 5–604?

We answer the first question in the negative and the second and third questions in the affirmative. As such, we affirm the Circuit Court for Baltimore City's grant of the motion to transfer and reverse the Circuit Court for Talbot County's grant of summary judgment and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 15, 2007, at approximately 6:15 p.m., Karen brought Bryson to the Memorial Hospital at Easton ("Easton Memorial") Emergency Department in Talbot County with complaints of congestion and trouble breathing. An evaluation in the Emergency Department revealed that Bryson had tachycardia, bilateral rhonchi, and diffuse wheezing. Due to the degree of Bryson's respiratory distress, and as a precaution, at 7:35 p.m. Easton Memorial medical personnel electively intubated Bryson. After the intubation, a decision was made to transfer Bryson to University of Maryland Medical System's ("UMMS") Pediatric Intensive Care Unit via helicopter, as Easton Memorial was unable to manage intubated children. UMMS contacted PHI Air Medical in order to effectuate the transfer. PHI Air Medical dispatched a helicopter and a pediatric transport team to Easton Memorial, consisting of several individuals, including a UMMS pediatric nurse and appellees' employee, Chris Barbour. Barbour was employed by appellees as a paramedic. In appellee's memorandum in support of the motion for summary judgment, they stated that: "Barbour was a paramedic licensed by the State of Maryland to provide medical care at the time of the incident—although he was still in paramedic orientation."[4]

_____

4. At deposition, Barbour testified that he was a licensed paramedic at the time of the incident. According to Brian Nevin, General Manager of TransCare Maryland, Inc., "Barbour [was] not a member of the helicopter transport team and was a paramedic trainee."

On November 16, 2007, at approximately 1:25 a.m., Bryson was placed on the helicopter for transport. Appellants allege that during transport, Bryson's airway became blocked by his endotracheal tube and he failed to receive sufficient oxygen. The transport team searched for a pediatric mask to deliver oxygen to Bryson, but were unable to locate the mask. As a result, the pilot landed at Bay Bridge Airport and located the mask for the transport team. Appellants contend that the oxygen mask was located too late and a lack of oxygen caused Bryson to suffer permanent brain damage.

In the memorandum in support of the Motion for Summary Judgment, appellees describe themselves as a "ground ambulance company." On November 9, 2009, Barbour testified in a deposition that appellee, TransCare Maryland, Inc. is "[a] private ambulance company." At the time of Bryson's transfer, appellee, TransCare Maryland, Inc., held licenses to operate as an Advanced Life Support Commercial Ambulance Service, Basic Life Support Commercial Ambulance Service, and Neonatal Life Support Commercial Ambulance Service.[5] It is undisputed that appellees did not own or operate the helicopter that transferred Bryson and, with the exception of Barbour, did not employ any of the personnel who took part in Bryson's medical aircraft transfer.

Appellees contract with UMMS to provide ground ambulance transport services. PHI Air Medical, a separate company, provides UMMS with air medical transport services. According to Theresa Drayer, the manager of Maryland ExpressCare, a part of UMMS, the contract between UMMS and each transportation provider is different. For ground ambulance transport services, UMMS has a contract with appellees under which UMMS pays appellees a monthly fee to provide ground equipment and personnel. For air medical transport services, UMMS has a contract with PHI Air Medical whereby PHI Air Medical provides air equipment and

---

5. TransCare Corporation, as the parent company, has no licenses or certificates to operate a medical transport service.

personnel at its own expense and without any fee or other payment from UMMS.

On February 6, 2009, appellants filed a two-count complaint in the Circuit Court for Baltimore City alleging: (1) negligence/medical malpractice and (2) loss of parental relationship and extraordinary costs and expenses against appellees. In the negligence/medical malpractice count, appellants sued appellees individually "and/or through [their] actual and/or apparent agents, representatives, and/or employee, Mr. Barb[our.]" Appellants alleged that appellees, individually and/or through Barbour, were negligent because, during Bryson's transfer, Barbour failed to follow the requisite standard of care for paramedics. In the Complaint, appellants allege that Barbour failed to provide adequate care to Bryson by failing "to remove the misplaced endotracheal tube and initiate masked ventilation or mouth-to-mouth breathing or intubation as appropriate," and by failing to promptly locate the oxygen mask. Appellants did not bring action against Barbour individually.

On March 27, 2009, appellees filed a Motion to Transfer to the Circuit Court for Talbot County on the grounds of *forum non conveniens.* On April 8, 2009, appellants filed an Opposition to the Motion to Transfer. On April 15, 2009, appellees filed a Reply. On May 29, 2009, the Circuit Court for Baltimore City conducted a hearing on the Motion to Transfer. During the hearing, as to appellants' choice of forum, the circuit court stated:

> What's the connection to Baltimore City? I mean I understand that I am suppose[d] to give some deference to [appellants'] choice of forum. But if [appellants] themselves or herself or whoever it is, resides in Talbot County, that kind of goes to the lower end of my analysis with regard to giving him that deference.

The Circuit Court for Baltimore City granted the Motion to Transfer to Talbot County, ruling orally from the bench as follows:

For the issues of Forum Non Convenien[s], it appears to this Court that the alleged occurrence occurred in Talbot County, that [appellants] live in Talbot County. Medical records, they could be in Baltimore City, they could be in Talbot County. But that's just pieces of paper tha[t] can be transferred by courier.

Key witnesses are located in Talbot County. Expert witnesses, experts choose to get into these cases. I'm not too concerned with that. Further treatment and provision of care occurs in Talbot County, and there seems to be very minimal connection to Baltimore City. I don't even know if I saw Baltimore City mentioned in the Complaint.

Now, I read some case law, 367 Maryland, that says, "The cause of action arises when the Plaintiff first experiences any injury from the alleged negligence of the Defendants." Soon after takeoff in Talbot County, onset of injuries occurred a few minutes after the aircraft['']s departure from Easton Memorial Hospital in Talbot County.

It appears that this incident is far removed from Baltimore City. There appears to be minimal connection to the community members of Baltimore City, that would not warrant an imposition on not only a congested docket, but a jury pool from Baltimore City.

It appears that the local interest is most appropriately in the County of Talbot County.

Now, I have to balance that with you know, [appellants'] choice of forum. However, [appellants] reside[ ] in Talbot County.

Based on all the factors that I've assessed, the Motion to Transfer for Forum Non Convenien[s], this case having full connections with Talbot County, minimal, minimal at best connection to Baltimore City, the motion is granted.

On the same day, the circuit court issued an Order consistent with the oral ruling.

On July 16, 2010, appellees filed a Motion for Summary Judgment in the Circuit Court for Talbot County. In the memorandum supporting the motion, appellees contended that

Bryson's negligence/medical malpractice claim is precluded by the Good Samaritan Act[6] and the Fire and Rescue Act.[7] Appellees contended that Karen's claim for loss of parental relationship is not recognized by Maryland law and sought to have the claim dismissed as a matter of law. On August 2, 2010, appellants filed an Opposition to the Motion for Summary Judgment arguing that the Good Samaritan Act and the Fire and Rescue Act are inapplicable to the circumstances of the case. In the Opposition, Karen withdrew the loss of parental relationship claim, but not the claim for extraordinary costs. On August 5, 2010, appellees filed a Reply to the Opposition.

On August 9, 2010, the circuit court held a hearing on the Motion for Summary Judgment. The circuit court denied the motion for summary judgment, ruling orally from the bench as follows:

Is it with the Court? All right, gentlemen, as I said I've been through the files and this case ... presents the question of the interpretation of Sections 5–603, the Good Samaritan Statute, or as I like to call it, no good deed goes unpunished statute. And 5–604 the immunity that is granted to fire and rescue companies. And of course as you gentlemen know the question for the Court today is whether there are factual disputes, material factual disputes that will effect the outcome of the case. The Court does not read 5–603 exactly as counsel for [appellees] does. The Section A(2) states that a person is not civilly liable if the assistance of medical care is provided without fee or other compensation. [Appellees' counsel] points out very clearly that there was no fee charged to [appellant] in this matter, Bryson Murray, and therefore since no compensation flowed from the victim to Transcare then Transcare qualifies under the statute. It is argued by [appellants' counsel] and on behalf

---

**6.** The Good Samaritan Act, codified at Md.Code Ann., Courts & Judicial Proceedings ("CJP") § 5–603, is titled "Emergency medical care."

**7.** The Fire and Rescue Act, codified at CJP § 5–604, is titled "Fire and rescue companies."

of [appellants] that [appellees] could elect not to bill particularly where a procedure goes bad and there are significant and serious and devastating consequences such as here. There's no doubt about the injuries and the lifelong impairment that Bryson Murray will experience. The question is whether the statute was intended to require a showing that there was actual compensation paid. This Court does not read it that way. There is a factual dispute as to the compensation that was paid anyone. We know that the helicopter company was paid some forty some thousand dollars as I recall. But the helicopter company is not in this action. I am told that there was an accord reached with the helicopter company, Petroleum, whatever that name of it was, and the University of Maryland. That's, as I said earlier, those matters are not before me. There is a contract between the University of Maryland and Transcare and/or Express Care. And there are allegations that Transcare and Express Care, and Maryland Express Care are one in the same. And there is not much doubt in the Court's mind that Chris Barb[our] was a part-time EMT that was assigned to this transfer from Easton to Baltimore of young Bryson Murray on the 15th day of November and some few minutes in the air because of the way he was intubated he was not getting the oxygen that he needed. There was difficulty in locating the bag valve mask, I believe is what that device is called, by Mr. Barb[our] and the pilot put the plane down, put the helicopter down at Bay Bridge Airport and they were able to locate the bag valve mask and proceeded on. But the precious moments without oxygen caused as I said significant permanent injury to young Bryson Murray. So there is indeed a dispute as to what compensation, if any, was paid. Clearly the helicopter company, which I suspect leases the helicopter to Express and Transcare of Maryland, or Express Care. And there is an exhibit in file showing a photograph of the particular helicopter with Express Care written on the side of it. Clearly those facts are in dispute. [Appellees' counsel] says Express Care and Transcare are not related, not joined at

the hip and that it is an error to suggest that it is. [Appellants' counsel] says, oh no, Transcare, Express Care is a subsidiary of Transcare and we all know that the EMT Mr. Barb[our] was employed at least at some point in time by Transcare. Whether he was paid for this, I don't know. And there is no way that this Court can know because he was paid a salary as I understand it as a part time EMT. I think he was working for the Waldorf Department of Utilities. This was a part time thing for him. On the issue of whether [appellees] qualify as a fire and rescue agency under Section 5–604, it seems certainly a dispute as to that. The case that we are pointed to are the *Mayor and City Council of Baltimore v. Sharon Chase*, which I've quoted from which says that 5–604 ... was intended to grant immunity to fire and rescue companies be they municipal or volunteer. Well we know that Transcare Maryland Inc. is not a municipal or a volunteer fire company or a rescue company, but [appellees' counsel] points out that it would qualify as a rescue company because it's an ambulance company that was engaged in transferring this young man on the 16th of November 2007. The Court notes that 5–603 does specifically refer to ambulance companies whereas 5–604 only refers to fire companies and rescue companies as being immune. This Court cannot extend the interpretation of a fire and rescue company to mean at least I cannot, to mean that that includes an ambulance for a for profit company that is providing transfer services from Easton to Baltimore be it by land or air. There are significant disputes of fact, significant disputes of fact that are material to the outcome of this case. [Appellees' counsel] points out that [appellees are] entitled to summary judg[ ]ment as a matter of law. I cannot resolve those factual disputes. And I'm afraid that either a jury or the Court of Appeals, Court of Special Appeals will have to do that for us by revisiting *Mayor and City Council of Baltimore v. Chase* and deciding whether or not it extends to a private, for profit ambulance company. And I don't know the answer to that. And maybe we all won't know until the Court of Special Appeals decides it. But at this point I'm going to deny the motion.

I'll hear you [appellants' counsel] on [appellees' counsel]'s suggestion that he would like to take an immediate appeal of the denial of the motion for summary judg[ ]ment.

On August 19, 2010, appellees filed a Motion for Reconsideration of the denial of the Motion for Summary Judgment. On September 7, 2010, appellants filed an Opposition to the Motion for Reconsideration. On September 16, 2010, appellees filed a Reply to appellants' Opposition.

On September 23, 2010, the circuit court held a hearing on appellees' Motion for Reconsideration. At the conclusion of the hearing, the circuit court granted the Motion for Reconsideration, ruling orally from the bench as follows:

Very well. Gentlemen and lady this case presents rather interesting statutory interpretation questions to the Court. And as you know the thing that concerned me when we were here earlier on August the 9th was whether [appellees] could control its liability by simply electing not to bill for their services, which to me was a rather strained interpretation of the statute ... that provides for qualified immunity where a person who is licensed by the State of Maryland to provide medical care provides assistance without fe[e] or other compensation. And it was troublesome because the Court felt that to apply that statute in a way that [appellees] could control [their] liability [ ] gave the statute an illogical interpretation. It boils down essentially to whether in this case Transcare, there is no question in the Court's mind that Mr. Barb[our] was a person who was licensed by the State of Maryland to provide medical care. That has not been argued. The question under 5–603 is whether the assistance provided by Mr. Barb[our] and/or his employer, his principle was provided without fee or the compensation. The second question is under 5–604, and that is whether a private ambulance company, private for a fee ambulance company is covered under the statute with respect to fire and rescue companies. And I made the distinction because, earlier, because 5–603 specifically addresses ambulance companies, whereas 5–603(b)(2) is a section that state where it's applicable it says a member of a state, county, municipal

or volunteer fire department, ambulance and rescue squad or law enforcement agency. And 5–604 does not use the word ambulance it only used fire and rescue companies as the, as the entities that are entitled to qualify for immunity. And certainly the General Assembly was aware of ambulance companies as being a component of 5–603 when they enacted 5–604, which I believe based on the reading of *Chase* was enacted as curative legislation because of a case that did not permit immunity for a paramedic with the Baltimore City I believe fire company. This Court is going to grant the motion to reconsider. And I'm going to grant the motion for summary judg[ ]ment. This case needs to be considered by the Court. The Court has provided some instruction in *Chase.* And that instruction leads me to the conclusion that I have reached because of several things. 5–604 as interpreted by the Court in *Chase* says that it applies to both public, municipal and private fire and rescue companies. While I believe that the intent of the legislature was to cover volunteer fire companies which are often private and not connected with a municipality. *Chase* really doesn't say that. It doesn't distinguish. In a broad way it says the statute applies to all, public and private fire and rescue companies. The last sentence is clear 5–604 was intended to grant immunity to fire and rescue companies be they municipal or volunteer but earlier it says the statute clearly and unequivocally refers to the fire and rescue companies. There is no differentiation at all between public and private companies. And while the Court may have been talking about private companies in the sense of private volunteer fire companies, which all have ambulance services and rescue services, the case doesn't make that distinction. And this Court cannot parse the words of the Court to mean that the Court's reference to private companies is only with respect to volunteer fire companies. The language is clear in its meaning, public and private companies. Transcare is a private for profit company. The question of compensation is ever more ... of a matter that the Court needs to consider. The statute is clear, if the assistance is provided without fee or compensation qualified immunity attaches

provided by a person licensed by the State of Maryland to provide that care. In this case it's clear that Transcare did not receive compensation although it was employed by the University of Maryland Medical System on a monthly basis and it was paid on a monthly basis to be on stand-by. There is no evidence before this Court and it's not disputed that they did not [ ] charge a fee for Mr. Barb[our]'s services that day as did the helicopter transport company, Petroleum Helicopter Services. And the cases say that the fee must be to the recipient, the victim in this case or the victim's parents. It's a question of law which this Court feels need not go to trial before it's determined by the Court of Special Appeals. And this Court is resolving ... this legal issue of immunity preliminarily so that the Court can determine whether I was right the first time or right this time or wrong both times, I don't know. But to require this case to go to trial without a determination by the Court of Special Appeals as to the immunity of Transcare under the statute to this member of the Court is unnecessary at this time. This Court feels that the interpretation of the statute cries for a judicial determination by minds that are far better than mine. And law clerks that are far better than mine because I don't have one. So, gentlemen, I'm going to grant the motion and it's my sincere hope that you will get it to the Court of Special Appeals as soon as possible because the outcome is important not only because of young Bryson Murray but because of any other person who may have this issue to try later. It's a difficult one for this Court so I'm going to grant the motion.

Consistent with the oral ruling, on September 23, 2010, the circuit court issued an Order granting the Motion for Reconsideration and summary judgment in favor of appellees. On October 8, 2010, appellants noted this appeal.

## DISCUSSION

### I.

Appellants contend that the Circuit Court for Baltimore City abused its discretion in transferring the action to the

Circuit Court for Talbot County on the grounds of *forum non conveniens* because: (1) the circuit court failed to give "proper regard" to appellants' choice of forum and (2) the convenience of the parties and witnesses and the interests of justice weighed strongly in favor of denying the motion to transfer. Appellants maintain that the circuit court abused its discretion by giving only "some deference" to appellants' choice of forum, and that in doing so, the circuit court "misapplied" case law that requires the court to give "proper regard" to appellants' choice of forum. Appellants acknowledge that a plaintiff's choice of forum has "minimal value" in a court's determination as to transfer of an action where the plaintiff is not a resident of the chosen forum, but contend that "this principle loses its force" when the defendants, such as appellees, are also not residents of the chosen forum.

Appellants contend that the circuit court improperly weighed the convenience of the parties and witnesses and the interests of justice factors. As to the convenience of the parties and witnesses, appellants argue that: (1) the circuit court improperly determined that the convenience of the parties weighed in favor of transferring the action, as there is no evidence that appellees reside, carry on regular business, are employed, or habitually engage in a vocation in Talbot County; (2) the circuit court failed "to give any weight to the convenience of the expert witnesses;" and (3) the circuit court improperly determined that the convenience of non-expert witnesses weighed in favor of granting the motion to transfer despite the fact that key witnesses are located in Baltimore City, such as the transport team, Bryson's treating physicians at UMMS, Johns Hopkins, and Kennedy Krieger, and Barbour, who works at UMMS.

As to the private interest factors, appellants maintain that this is a "complex medical malpractice case" and that the Circuit Court for Baltimore City is better equipped than the Circuit Court for Talbot County to handle a lengthy complex case with numerous expert and fact witnesses. As to the public interest factors, appellants contend that those factors weighed strongly in favor of denial of the motion to transfer.

Appellants assert that Baltimore City has a "significant local interest" in adjudication of the actions because: (1) providing safe medical transport is a significant interest to "every citizen in the state of Maryland, including Baltimore City;" (2) Bryson was transported to UMMS in Baltimore City, pursuant to a contract between UMMS and the air transport company; (3) the transport team came from UMMS in Baltimore City; and (4) UMMS, Johns Hopkins Hospital, and Kennedy Krieger Institute, all located in Baltimore City, provided the majority of Bryson's care.

Appellees respond that application of the legal standards for granting transfer on the grounds of *forum non conveniens* to the facts of the case confirms that the circuit court properly granted the motion for transfer. Appellees argue that a plaintiff's choice of forum "is not an absolute and uncontrolled privilege that is determinative under present *forum non conveniens* law," and that the choice has minimal value, in a case such as this, where appellants are not residents of the forum in which they bring the action. Appellees contend that the "overall convenience of the parties and witnesses to this action was best served through transfer of the action to the Circuit Court for Talbot County." Appellees argue that appellants are residents of Talbot County, and that healthcare providers and witnesses to Bryson's care and treatment at Easton Memorial, located in Talbot County, are also likely residents of Talbot County, thereby making it "at least as convenient . . . to travel to the courthouse as it [is] to travel to work."

Appellees maintain that the circuit court properly determined that private interest factors, such as ensuring ease of access to evidence, the availability of compulsory process, the cost of obtaining the attendance of witnesses, and "other practical considerations" weighed in favor of the transfer. As to public interest factors, appellees contend that because the action involves matters unrelated to the citizens of Baltimore City but of local interest to the community in Talbot County, the circuit court correctly determined that the public interest factors of court congestion and the burden of jury duty on the community weighed in favor of transferring the case to Talbot

County. Specifically, appellees maintain that "[t]he acts or omissions at issue in treating a resident of Talbot County, while still in Talbot County, neither affect the community members of Baltimore City nor warrant the imposition of jury duty on the residents of Baltimore City." Appellees argue that based on the circuit court's consideration of all of the factors and reasoned analysis, "it cannot be said that no reasonable court would [have found] that transfer of venue was warranted." Simply put, we agree.

Maryland Rule 2–327(c) states that "[o]n motion of any party, the court may transfer any action to any other circuit court where the action might have been brought if the transfer is for the convenience of the parties and witnesses and serves the interests of justice." In reviewing a grant of a motion to transfer under Md. Rule 2–327(c), we review the circuit court's decision under an abuse of discretion standard. *Stidham v. Morris,* 161 Md.App. 562, 566, 870 A.2d 1285 (2005). "An abuse of discretion is said to occur where no reasonable person would take the view adopted by the trial court, or when the court acts without reference to any guiding rules or principles. Accordingly, when reviewing a motion to transfer, a reviewing court should be reluctant to substitute its judgment for that of the trial court." *Cobrand v. Adventist Healthcare, Inc.,* 149 Md.App. 431, 437, 816 A.2d 117 (2003) (internal quotations and citations omitted). Upon review:

> *"The exercise of a judge's discretion is presumed to be correct,* he is presumed to know the law, and is presumed to have performed his duties properly." Absent an indication from the record that the trial judge misapplied or misstated the applicable legal principles, *the presumption is sufficient for us to find no abuse of discretion.* Additionally, *a trial judge's failure to state each and every consideration or factor* in a particular applicable standard does not, absent more, *constitute an abuse of discretion,* so long as the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion.

*Payton–Henderson v. Evans,* 180 Md.App. 267, 286, 949 A.2d 654 (2008) (emphasis in original) (quoting *Cobrand,* 149 Md. App. at 445, 816 A.2d 117). Because "we may not have chosen to transfer th[e] case," does not mean that a trial judge abused his or her discretion because "we should [not] simply substitute our judgment for that of the trial court." *Urquhart v. Simmons,* 339 Md. 1, 19, 660 A.2d 412 (1995).

## Plaintiff's Choice of Forum

A court's discretion in transferring an action is not unlimited. *Stidham,* 161 Md.App. at 567, 870 A.2d 1285. A plaintiff's choice of forum must be given "proper regard," and the plaintiff's choice will not be "altered solely because it is more convenient for the moving party to be in another forum." *Leung v. Nunes,* 354 Md. 217, 224, 729 A.2d 956 (1999) (citations and quotations omitted). Nonetheless, the plaintiff's choice of forum is not dispositive and "less deference should be accorded" to a plaintiff's choice when the plaintiff is not a resident of the forum or when the choice of forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Stidham,* 161 Md.App. at 569, 870 A.2d 1285 (internal quotations and citations omitted); see also *Nodeen v. Sigurdsson,* 408 Md. 167, 968 A.2d 1075 (2009) (The Court of Appeals held that the Circuit Court for Calvert County erred in granting of motion to transfer venue to Anne Arundel County, when the plaintiff resided in Calvert County, stating: "When 'at best, the balancing of factors produce an equipoise, the plaintiff['s] choice of forum controls.' ").

## Convenience of the Parties and Witnesses

A motion to transfer may only be granted when the balance between two factors—convenience of the parties and witnesses and the interests of justice—weigh strongly in favor of the moving party. *Odenton Dev. Co. v. Lamy,* 320 Md. 33, 40, 575 A.2d 1235 (1990) (citations omitted). The party who moves to transfer an action under Md. Rule 2–327(c) has the burden of proving that transferring the action is

more convenient and better serves the interests of justice. *Id.* (citations omitted). The convenience factor consists of the convenience of the parties and witnesses. *Stidham,* 161 Md. App. at 568, 870 A.2d 1285. In *Payton–Henderson,* 180 Md.App. at 289–91, 949 A.2d 654, this Court's review of the convenience of the parties and non-expert witnesses centered around where the parties and witnesses lived and worked in relation to the court. As to expert witnesses, however, this Court has given little weight to their convenience. *Smith v. State Farm Mut. Auto. Ins. Co.,* 169 Md.App. 286, 302, 900 A.2d 301 (2006) (We provided that a plaintiff's "allegation about his possible expert is entitled to some weight, but not much.").

### Private and Public Interests of Justice

The interests of justice factor requires a court to weigh both private and public interests. *Stidham,* 161 Md. App. at 568, 870 A.2d 1285 (citations omitted). Private interests of justice "concern[ ] the efficacy of the trial process itself. It is deemed a 'private interest' because it is concerned only with a particular case." *Payton–Henderson,* 180 Md.App. at 292, 949 A.2d 654. We have stated that private interests of justice include: (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) possibility of view of premises (the subject of the action or where the incident occurred), if view would be appropriate to the action; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Stidham,* 161 Md.App. at 568, 870 A.2d 1285 (citations omitted). Public interests of justice, on the other hand, "embrace[ ] such broad citizen concerns as the county's road system, its educational system, its governmental integrity, its police protection, its crime problem, its fire protection, etc." *Payton–Henderson,* 180 Md.App. at 293, 949 A.2d 654. Public interests of justice include: (1) considerations of court congestion; (2) the burden of jury duty; and (3) local interest

in the matter at hand. *Stidham,* 161 Md.App. at 569, 870 A.2d 1285 (citations omitted).

## Analysis

 Returning to the case at hand, appellants chose a forum, Baltimore City, in which neither appellants nor appellees reside.[8] Although the circuit court was required to give "proper regard" to appellants' choice of forum, it correctly gave less deference to the chosen forum as appellants reside in Talbot County—the eventual county of transfer—not Baltimore City. The record reflects that during the hearing on the Motion to Transfer, the circuit court stated: "What's the connection to Baltimore City? I mean I understand that I am suppose[d] to give some deference to [appellants'] choice of forum. But if [appellants] themselves ... reside[ ] in Talbot County, that kind of goes to the lower end of my analysis with regard to giving [them] that deference." [9] This statement

---

8. TransCare Corporation is incorporated in the State of Delaware and has its principal place of business in the State of New York. TransCare Maryland, Inc. is incorporated in the State of Delaware and has its principal place of business in Baltimore County.

9. Appellants argue that, in deciding the motion to transfer, the circuit court abused its discretion by incorrectly finding that appellants failed to mention Baltimore City in the Complaint. Appellants contend that this was an erroneous finding of fact as: (1) appellants' complaint stated "venue is proper in Baltimore City;" (2) Bryson's medical records "clearly show" Easton Memorial contacted UMMS, which is located in Baltimore City, to arrange Bryson's transfer; (3) the helicopter transport team left from UMMS; (4) at the time of the incident, Bryson was being transferred to UMMS; and (5) after the incident, Bryson received medical care from UMMS, Johns Hopkins Hospital, and the Kennedy Krieger Institute, all located in Baltimore City. This contention is without merit. The record reflects that the motion judge stated:

For the issues of Forum Non Conveniens, it appears to this Court that the alleged occurrence occurred in Talbot County, that the Plaintiffs live in Talbot County. Medical records, they could be in Baltimore City, they could be in Talbot County. But that's just pieces of paper tha[t] can be transferred by courier.

Key witnesses are located in Talbot County. Expert witnesses, experts choose to get into these cases. I'm not too concerned with that. Further treatment and provision of care occurs in Talbot

demonstrates that the circuit court weighed and considered appellants' choice. As we have previously noted, "the exercise of a judge's discretion is presumed to be correct ... [and] a trial judge's failure to state each and every consideration or factor ... does not, absent more, constitute an abuse of discretion, so long as the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion." *Payton–Henderson*, 180 Md.App. at 286, 949 A.2d 654 (internal quotations, citation, and emphasis omitted). We see no abuse of discretion in the circuit court's consideration of appellants' choice of forum.

Upon review of the circuit court's ruling on the motion to transfer, we conclude that the circuit court properly evaluated the motion under the *forum non conveniens* factors—convenience of the parties and witnesses and the interests of justice. When evaluating the convenience of the parties, the circuit court noted that appellants "live in Talbot County." Appellees' principal place of business is not in either Baltimore City or Talbot County. As to expert witnesses, the circuit court stated that "experts choose to get into these cases. I'm not too concerned with that." The circuit court's finding on the matter of expert witnesses was not an abuse of discretion in

---

County, and there seems to be very minimal connection to Baltimore City. **I don't even know if I saw Baltimore City mentioned in the Complaint.**

Now, I read some case law, 367 Maryland, that says, "The cause of actions arises when the Plaintiff first experiences any injury from the alleged negligence of the Defendants." Soon after takeoff in Talbot County, onset of injuries occurred a few minutes after the aircraft[']s departure from Easton Memorial Hospital in Talbot County.

It appears that this incident is far removed from Baltimore City. There appears to be minimal connection to community members of Baltimore City, that would not warrant an imposition on not only a congested docket, but a jury pool from Baltimore City.

It appears that the local interest is most appropriately in the County of Talbot County.

Now, I have to balance that with you know, [appellants'] choice of forum. However, [appellants] reside[ ] in Talbot County.

(Emphasis added). Read in context, the circuit court's comment regarding Baltimore City not appearing in the complaint was a superfluous remark and not an erroneous finding of fact as appellants argue. We decline to address the argument further.

light of our previous holding that little weight is to be accorded to the convenience of expert witnesses. *Smith,* 169 Md. App. at 302, 900 A.2d 301 (A plaintiff's "allegation about his possible expert is entitled to some weight, but not much."). As to non-expert witnesses, the circuit court stated that "[k]ey witnesses are located in Talbot County." Although the non-expert witnesses were not specifically listed or identified by the circuit court in its oral ruling, it was reasonable for the court to conclude that residents of Talbot County would be called to testify at trial, including doctors and nurses from Easton Memorial who treated Bryson, and appellants themselves. As such, the record demonstrates the circuit court considered the convenience of the parties and witnesses and determined that this was a factor that weighed in favor of transfer.

Insofar as the interests of justice are concerned, the circuit court properly weighed and considered the public and private interest factors and found them to weigh in favor of granting the Motion to Transfer to Talbot County. As to the private interest factors, the circuit court observed that ease of access to sources of proof was not an issue as medical records, whether located in Talbot County or Baltimore City, are easily transported. Although there were no premises to be viewed, the circuit court stated that "the alleged occurrence occurred in Talbot County" and that "[s]oon after takeoff in Talbot County, onset of injuries occurred a few minutes after the [aircraft[']s departure from Easton Memorial Hospital in Talbot County." Thus, the circuit court was persuaded that the private interests of justice inherent to the specific case weighed in favor of transfer to Talbot County. As we stated in *Stidham,* "[t]here is a local interest in having localized controversies decided at home." 161 Md.App. at 571, 870 A.2d 1285 (quotations and citation omitted). We perceive no abuse of discretion in the circuit court's analysis of the private interest factors.

As to the public interest factors, or those factors of general concern to the community, the circuit court stated:

Further treatment and provision of care occurs in Talbot County, and there seems to be very minimal connection to Baltimore City ... It appears that this incident is far removed from Baltimore City. There appears to be minimal connection to the community members of Baltimore City, that would not warrant an imposition on not only a congested docket, but a jury pool from Baltimore City.

It appears that the local interest is most appropriately in the County of Talbot County.

The circuit court's ruling demonstrates that the court considered most, if not all, of the public interests of justice factors outlined by this Court in *Stidham*, 161 Md.App. at 569, 870 A.2d 1285, including "court congestion, the burden of jury duty, and local interest in the matter" at hand. In *Payton–Henderson*, 180 Md.App. at 272–73, 294, 949 A.2d 654, we found no error in the determination by the Circuit Court for Baltimore City that there was a high degree of local interest in the case in Baltimore County, which warranted transfer of the case on the grounds of *forum non conveniens*. We stated:

A possibly protracted trial involving numerous witnesses is a burden properly to be assumed by the Baltimore County court system and not one that should be foisted onto the strained court system of Baltimore City. There is no reason, moreover, why the cost and obligation of jury service should be cast upon the citizens of Baltimore City for the trial of a matter of more vital and immediate concern to the citizens of Baltimore County.

*Id.* at 294, 949 A.2d 654. A similar rationale is applicable in this case. Talbot County has a significant local interest in the case because Bryson, a Talbot County resident, was taken to a hospital in Talbot County and intubated there. As discussed above, the circuit court noted the injury "occurred in Talbot County," starting in Easton Memorial and continuing into transport in the aircraft over Talbot County. Appellants brought this action as a result of injury occurring before

Bryson's arrival in Baltimore City.[10] As such, the component of local interest in the matter as both a private and public interest factor weighed strongly in favor of transfer. The circuit court considered factors such as imposition on the court's docket and jury pool and determined that there was "minimal connection to ... Baltimore City, that would [ ] warrant an imposition on not only a congested docket, but a jury pool from Baltimore City." In *Payton–Henderson,* 180 Md.App. at 293, 949 A.2d 654, we determined that the circuit court, utilizing the same grounds, gave proper weight to the public interest consideration for transfer of the case to Baltimore County. For all of the reasons set forth above, we conclude that the circuit court properly weighed the factors applicable in a *forum non conveniens* review, and properly exercised its discretion in granting the motion to transfer because the case "had minimal at best connection to Baltimore City."

## II.

Appellants contend that the circuit court erred in granting summary judgment in favor of appellees because the Good Samaritan Act, CJP § 5–603, does not apply to private commercial ambulance companies and, therefore, appellees are not immune under the Act. Appellants maintain that the legislative history of the Good Samaritan Act demonstrates that "it has never been amended to include a private, for-profit ambulance company[ ]" and that the General Assembly did not intend to provide immunity to "a private, for-profit ambulance company[ ]" like appellees. Appellants argue that the Good Samaritan Act "does not require the patient to be charged a fee" for services rendered and "does not indicate that 'fee

10. At oral argument, appellants argued that the Circuit Court for Talbot County's handling of the case and rulings subsequent to transfer demonstrate that the court was not equipped to manage the case and, as such, the Circuit Court for Baltimore City erred in granting appellees' Motion to Transfer. This contention is without merit. Rulings by the Circuit Court for Talbot County after transfer of the case are not to be considered in determining whether the Circuit Court for Baltimore City abused its discretion in granting the Motion to Transfer.

and/or other compensation' is specifically limited to payment or compensation directly from the patient." Appellants contend that appellees "did in fact receive or had the legal right to receive a fee or compensation for the time that Mr. Barbour provided assistance or medical care to Bryson[,]" and that appellees cannot evade liability by choosing not to bill a patient. Appellants argue that appellees do, "in fact bill patients . . . contractually through UMMS."

Appellees respond that the circuit court properly granted summary judgment under the Good Samaritan Act in their favor. Appellees argue that the Act "applies to any individual licensed by the State to provide medical care[,]" and that the Act covers Barbour, who was a licensed paramedic member of an ambulance squad at the time of the incident. Appellees contend that because Barbour, their employee, is immune under the Act, they also are immune. Appellees maintain that the " 'for-profit' status of a medical care provider or entity does not create a blanket prohibition on the application of the Good Samaritan statute." Appellees contend that they meet the three basic requirements of the Good Samaritan Act, in that: (1) there was no act or omission of gross negligence; (2) the act or assistance was provided without fee or other compensation; and (3) the assistance or medical care was provided in transit to a medical facility. Appellees argue they are, therefore, afforded immunity under the Act's application. As to the second requirement, of no fee or other compensation, appellees contend that they "billed in accordance with the usual practices of all entities involved[,]" and that they (appellees) did not receive compensation through their contract with UMMS barring application of the Good Samaritan Act.

In reviewing a grant of summary judgment under Md. Rule 2–501(f), we review the circuit court's decision to grant a motion for summary judgment *de novo*. *Bonfiglio v. Fitzgerald*, 197 Md.App. 327, 337 (2011) (citations omitted). Our review is "two-fold," in that we determine first, whether there is a genuine dispute of material fact, and second, whether the party is entitled to judgment as a matter of law. *Id.* In determining whether a material fact is in dispute, a trial court

must give great deference to the non-moving party as well as review the record in the light most favorable to the non-moving party. *Lipscomb v. Hess*, 255 Md. 109, 118, 257 A.2d 178 (1969) (citations omitted).

Interpretation of the Good Samaritan Act by Maryland appellate courts has been limited; as such, we are guided by the principles of statutory interpretation. "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. In that task, we must 'look first to the language of the statute, giving it its natural and ordinary meaning.' " *Montgomery County v. Deibler*, 423 Md. 54, 60, 31 A.3d 191 (2011) (internal citations omitted). In *Lark v. Montgomery Hospice, Inc.*, 414 Md. 215, 227–28, 994 A.2d 968 (2010), the Court of Appeals recently stated that:

> A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious

body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

(Citing *Lockshin v. Semsker*, 412 Md. 257, 274–76, 987 A.2d 18 (2010)). As recently explained by Judge Mary Ellen Barbera, in *DeWolfe v. Richmond*, —— Md. ——, ——, —— A.2d ——, 2012 WL 10853, No. 34, September Term 2011, Slip op. at 28 (filed January 4, 2012):

> The first principle of statutory construction is that the legislative purpose is to be ascertained, if possible, from the plain language of the statute at issue. If the language of the statute is plain and unambiguous, then our role in determining the legislative purpose ends. Moreover, though we may, but need not, point to the legislative history as confirmation of the purpose expressed through the statute's plain language, we may not undertake a search of a plainly written statute's legislative history to seek out evidence of a contrary intent by the General Assembly.

(Citations omitted).

### (1) Plain Language

██ The issue in this case is whether appellees are protected from civil liability under the Good Samaritan Act and, as a result, are entitled to summary judgment. The Good Samaritan Act, codified at CJP § 5–603 and titled "Emergency medical care," provides immunity to a broad class of rescuers and medical providers for any act or omission in giving assistance or medical care provided without fee or other compensation, unless grossly negligent, (1) at the scene of an emergency, (2) in transit to a medical facility, or (3) through communications with personnel providing emergency assistance. Specifically, CJP § 5–603 provides as follows:

(a) In general.—A **person** described in subsection (b) of this section is not civilly liable for any act or omission in giving any assistance or medical care, if:

(1) The act or omission is not one of gross negligence;

(2) The assistance or medical care is provided without fee or other compensation; and

(3) The assistance or medical care is provided:

(i) At the scene of an emergency;

(ii) In transit to a medical facility; or

(iii) Through communications with personnel providing emergency assistance.

(b) Applicability.—Subsection (a) of this section applies to the following:

(1) An **individual** who is licensed by this State to provide medical care;

(2) A **member** of any State, county, municipal, or volunteer fire department, ambulance and rescue squad, or law enforcement agency, the National Ski Patrol System, or a corporate fire department responding to a call outside of its corporate premises, if the member:

(i) Has completed an American Red Cross course in advanced first aid and has a current card showing that status;

(ii) Has completed an equivalent of an American Red Cross course in advanced first aid, as determined by the Secretary of Health and Mental Hygiene; or

(iii) Is certified or licensed by this State as an emergency medical services provider;

(3) A volunteer fire department or ambulance and rescue squad whose members have immunity; and

(4) A corporation when its fire department personnel are immune under paragraph (2) of this subsection.

(c) Immunity for **individual** not covered by this section.— An **individual** who is not covered otherwise by this section is not civilly liable for any act or omission in providing assistance or medical aid to a victim at the scene of an emergency, if:

(1) The assistance or aid is provided in a reasonably prudent manner;

(2) The assistance or aid is provided without fee or other compensation; and

(3) The individual relinquishes care of the victim when someone who is licensed or certified by this State to provide medical care or services becomes available to take responsibility.

(Emphasis added). The Act does not provide a definition of "person," "individual," or "member." A review of the plain meaning of those terms, however, supports the conclusion a private commercial ambulance company, is not covered by those terms, and, therefore, is not immune by application of the Act. Black's Law Dictionary 1178 (8th ed. 1999), defines "person" as: "A human being.—Also termed *natural person*." *See also* Merriam–Webster's Collegiate Dictionary 924 (11th ed. 2003) ("Person" is defined as "human, individual.") "Individual" is defined as: "1. Existing as an indivisible entity. 2. Of or relating to a single person or thing, as opposed to a group." Black's Law Dictionary 789 (8th ed. 1999). Merriam–Webster's Collegiate Dictionary 635 (11th ed. 2003) defines "individual" as follows: "a particular being or thing as distinguished from a class, species, or collection as (1): a single human being as contrasted with a social group or institution." "Member" is defined as "one of the individuals composing a group." Merriam–Webster's Collegiate Dictionary 774 (11th ed. 2003).

 Through the plain meaning of its terms, the Good Samaritan Act, with the exceptions outlined in (b)(3) and (b)(4), is applicable solely to individual persons—not companies or corporations such as appellees—who render aid meeting the requirements set forth in subsection (a).[11] Appellants

---

11. Good Samaritan laws in other states apply solely to individual persons or certain classes of persons as well. *See, e.g.,* D.C.Code Ann. § 7–401 (2011) (The District of Columbia's Good Samaritan law applies, under certain circumstances, to "[a]ny **person**," "certified emergency medical technician/paramedic or emergency medical technician/intermediate paramedic," and "a licensed physician.") (emphasis added); Me.Rev.Stat. Ann. tit. 14, § 164 (2011) (Maine's Good Samaritan law applies to "any **person** who voluntarily ... renders first aid,

did not sue Barbour individually as a "person" and Barbour is

emergency treatment or rescue assistance" and to "**members** or **employees** of nonprofit volunteer or governmental ambulance, rescue or emergency units.") (emphasis added); N.J. Stat. Ann. § 2A:62A–1 (2011) (New Jersey's Good Samaritan law applies to "[a]ny **individual,** including **a person** licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, or any **person** who is a volunteer **member** of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association ....") (emphasis added); N.C. Gen.Stat. § 20–166(d) (2011) (North Carolina's Good Samaritan law applies to "[a]ny **person** who renders first aid or emergency assistance at the scene of a motor vehicle crash on any street or highway to any person injured as a result of the accident ....") (emphasis added); Ohio Rev.Code Ann. § 2305.23 (Ohio's Good Samaritan law applies to any "**person**" who administers "emergency care or treatment at the scene of an emergency ....") (emphasis added); Okla. Stat. tit. 76, § 5 (2011) (Oklahoma's Good Samaritan law applies to four groups of people, including any **person** (1) "licensed to practice any method of treatment of human ailments ... including licensed registered and practical nurses," (2) "who in good faith renders or attempts to render emergency care," (3) "licensed to perform surgery or dentistry in this state," and (4) "who has been granted appropriate authorization ... to indicate by sign in the window of his home or in any other tangible or identifiable manner that he will extend aid and refuge to persons on the streets in apparent danger, or in need of aid[.]") (emphasis added); S.C.Code Ann. § 15–1–310 (2011) (South Carolina's Good Samaritan law applies to "[a]ny **person,** who in good faith gratuitously renders emergency care at the scene of an accident or emergency to the victim thereof ....") (emphasis added); Wis. Stat. § 895.48 (2011) (Wisconsin's Good Samaritan law applies to "[a]ny **person** who renders emergency care at the scene of any emergency or accident," but does not apply "when employees trained in health care or health care professionals render emergency care for compensation and within the scope of their usual and customary employment or practice at a hospital or other institution equipped with hospital facilities, at the scene of any emergency or accident, enroute to a hospital or other institution equipped with hospital facilities or at a physicians office.") (emphasis added). *See also Praet v. Sayreville,* 218 N.J.Super. 218, 527 A.2d 486, 488–89 (App.Div.1987) ("In 1968, the [Good Samaritan] Act was amended to extend its applicability to '[a]ny individual,' not just a health care licensee.... Thus, the grant of legislative immunity to a volunteer was designed, simply and obviously, to encourage gratuitous assistance by those who have no legal obligation to render it.") (alteration in original); *Mueller v. McMillian Warner Ins. Co.,* 290 Wis.2d 571, 714 N.W.2d 183, 191 (2006) ("The original Good Samaritan statute ... provided immunity only to medical professionals who rendered emergency care. In 1977 a Good Samaritan statute was adopted to extend ... protection to laypersons.... [T]he statute has remained unchanged since 1977.").

not an appellee in the case. Whether or not Barbour would be immune under subsections (b)(1), (b)(2), or (c) is irrelevant for purposes of our analysis.

Assuming *arguendo* that Barbour is immune under the Act, appellees do not, as they argue, automatically become immune under the Act via Barbour's immunity. In order for a company or corporate entity to enjoy the immunity provided under the Good Samaritan Act, that company or corporate entity must qualify under either (b)(3) or (b)(4). Subsection (b)(3) clearly applies to **volunteer** fire departments or ambulance and rescue squads whose members have immunity, and subsection (b)(4) applies only to a corporation when its fire department personnel are immune under (b)(2). Subsection (b)(3) is clearly inapplicable as it is undisputed that appellee, TransCare Maryland Inc., is a private commercial ambulance company, and not a volunteer ambulance squad. Subsection (b)(4) is inapplicable as well as appellees have not contended that they maintain, or are, a fire department, or that Barbour was employed as "fire department personnel."

In their brief, appellees expressly acknowledge that the Good Samaritan Act "applies to any **individual** licensed by the State to provide medical care." (Emphasis added). Appellees wrongly conclude, however, that because Barbour could be immune under the Act, they too are immune. That simply is not the case; when the General Assembly wishes to provide immunity to companies or corporations, it is capable of doing so and has done so. For example, the Fire and Rescue Act, codified at CJP § 5–604, clearly provides immunity to "a fire **company** or rescue **company,** and the personnel of a fire company or rescue company." (Emphasis added). For all of the reasons stated above, we conclude that under a plain language analysis, CJP § 5–603 does not provide immunity to private commercial ambulance companies that are not "persons," "individuals," or "members" under the Act.

### (2) Legislative History

In *Tatum v. Gigliotti,* 80 Md.App. 559, 566–67, 565 A.2d 354 (1989), *aff'd,* 321 Md. 623, 583 A.2d 1062 (1991), Judge Paul E.

Alpert, speaking for this Court, discussed the relevant legislative history of the Good Samaritan Act as follows:

The original Good Samaritan Law in Maryland was enacted in 1963 by Chapter 65, Laws of Maryland 1963; it provided protection in certain circumstances only to "a physician licensed to practice medicine by the Board of Medical Examiners of the State of Maryland." [ ] The next year the law was amended by Chapter 48, Laws of Maryland 1964, to add coverage for "trained members of volunteer ambulance and rescue squads." [ ] In 1965 the General Assembly enacted Chapter 475, Laws of Maryland 1965, which expanded the law to include registered nurses and licensed practical nurses. Chapter 616, Laws of Maryland 1969, added coverage for members and employees of fire departments or ambulance and rescue squads. Of interest to our analysis [in *Tatum*] is the fact that the legislature dropped the word "volunteer" that preceded "ambulance and rescue squads" when it amended the law in 1969.[ ]

In 1970 the General Assembly completely revised the "Practitioners of Medicine" subtitle in Article 43, which contained the Good Samaritan Law. That law was renumbered as § 132 of Article 43, but otherwise was left basically intact. Finally in 1976, the General Assembly repealed and reenacted the Good Samaritan Law, consolidating the various provisions that had been enacted over the years into four subsections found in the applicable statute at the time of this incident.

In 1982, in House Bill 523, Chapter 770, § 4, the General Assembly amended § 132 of Article 43, and recodified the Good Samaritan Act at CJP § 5–309. In 1982, CJP § 5–309 provided as follows:

(A) Immunity for Special Personnel.

A person described in subsection (B) of this section is not civilly liable for any act or omission in giving any assistance or medical care, if:

(1) The act or omission is not one of gross negligence;

(2) The assistance or medical care is provided without fee or other compensation; and

(3) The assistance or medical care is provided:

(i) At the scene of an emergency;

(ii) In transit to a medical facility; or

(iii) Through communications with personnel providing emergency assistance.

(B) *Special Personnel Included.*

Subsection (A) of this section applies to the following:

(1) An individual who is licensed by this State to provide medical care;

(2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad, or law enforcement agency, or of the National Ski Patrol System, if the member:

(i) Has completed an American Red Cross course in advanced first aid and has a current card showing that status;

(ii) Has completed an equivalent of an American Red Cross course in advanced first aid, as determined by the Secretary of Health and Mental Hygiene; or

(iii) Is certified by this State as an emergency medical technician or cardiac rescue technician; and

(3) A volunteer fire department, ambulance and rescue squad whose members have immunity.

(C) Immunity For Other Individuals.

An individual who is not covered otherwise by this section is not civilly liable for any act or omission in providing assistance or medical aid to a victim at the scene of an emergency, if:

(1) The assistance or aid is provided in a reasonably prudent manner;

(2) The assistance or aid is provided without fee or other compensation; and

(3) The individual relinquishes care of the victim when someone who is licensed or certified by this State to provide

medical care or services becomes available to take responsibility.

The General Assembly stated the purpose of the amendment as follows:

Subsection (a) of this section establishes the standards for granting immunity from tort liability for **persons** providing emergency medical care.

Subsection (b) of this section describes the **persons** who are not liable if the standards of subsection (a) are met.

Subsection (c) of this section describes an **individual** who is not covered by subsection (b) of this section—i.e., **one** who is not trained in providing medical care. The standards for providing immunity for the nonprofessional who gives emergency medical care also are different—the reasonably prudent manner standard applies to **individuals** covered by subsection (c) of this section.

(Emphasis added).

In 1982, in House Bill 1872, Chapter 775, the General Assembly amended subsection (b) of CJP § 5–309 as follows:

(b) Subsection (a) of this section applies to the following:

(1) An individual who is licensed by this State to provide medical care;

(2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad, or law enforcement agency, the National Ski Patrol System, or a corporate fire department responding to a call outside of its corporate premises, if the member:

(i) Has completed an American Red Cross course in advanced first aid and has a current card showing that status;

(ii) Has completed an equivalent of an American Red Cross course in advanced first aid, as determined by the Secretary of Health and Mental Hygiene; or

(iii) Is certified by this State as an emergency medical technician or cardiac rescue technician; and

(3) A volunteer fire department, ambulance and rescue squad whose members have immunity; and

(4) A corporation when its fire department personnel are immune under paragraph (2) of this subsection.

The General Assembly stated the amendment was "FOR the purpose of providing immunity from civil liability **for certain corporations** and certain fire department personnel rendering aid under certain conditions[.]" (Emphasis added). The addition of CJP § 5-309(b)(4) extended immunity from civil liability to certain corporations providing support or sponsoring an in-house fire department when the department assists at an off-site emergency.[12]

In 1983, in House Bill 851, Chapter 248, CJP § 5-309 was amended "FOR the purpose of providing that certain paramedical personnel are not civilly liable for giving assistance under certain circumstances[.]" In 1983, the General Assembly added the following language to CJP § 5-309(b)(2)(iii): "(iii) Is certified or licensed by this State as an emergency

---

12. An example of such a corporation is the Columbia LNG Corp. The File of House Bill No. 1872, includes a Statement by Max M. Levy made before the Judiciary Committee of the House of Delegates, Maryland General Assembly, in support of amending CJP § 5-309 to include subsection (b)(4). Levy was the senior vice president of the Columbia LNG Corp., which operated and co-owned the Cove Point Liquified Natural Gas Terminal located in Calvert County. Levy explained that as part of the safety features of the Terminal, Columbia LNG Corp. owned and operated two fire trucks, and a first aid vehicle. Levy explained: "These vehicles were initially provided for exclusive use at the Terminal. But because the fire departments in this County are all volunteer and suffer manpower shortages on weekdays, my company permits our trucks to render assistance to the public in fire and first aid emergencies away from our premises." Levy supported the amendment stating: "While we are more than willing to be of service to the community in responding to requests for emergency assistance, my company is quite concerned with the civil liability that we could incur in doing so."

Another example of such a corporation was the Bethlehem Steel Corporation which owned a fire station located in the Sparrows Point Complex and employed firefighters until 1988. O'Brien, Dennis, *Beth. Steel opposes station plan*, Baltimore Sun, April 26, 1999, http://articles. baltimoresun.com/1999–04–26/news/9904260115_1_bethlehem-steelsparrows-point-fire-station.

medical technician, [or] cardiac rescue technician, OR EMER-GENCY MEDICAL TECHNICIAN–PARAMEDIC[.]"

The "Editor's Note[s]" of CJP § 5–603 provide that:

Section 9, ch. 14, Acts 1997, approved Apr. 8, 1997, and effective from date of enactment, transferred former § 5–309 of this article to be present § 5–603 of this article.

Section 2, ch. 561, Acts 1997, provides that "this Act is intended to clarify that an **individual** who is certified by the State as an emergency medical technician-paramedic, also known as an 'EMT–P' or 'paramedic', is entitled under § 5–309(b)(2)(iii) [now § 5–603(b)(2)(iii) ] of the Courts Article to qualified immunity from civil liability for providing emergency assistance or medical care."

(Emphasis added).[13]

Nothing in the legislative history demonstrates an intent by the General Assembly to extend immunity to private commercial ambulance companies. In fact, the legislative history specifically demonstrates the General Assembly's intent to extend immunity to certain persons and corporations, but not private commercial ambulance companies.[14] As stated above,

---

13. In 2008, in Senate Bill 601, Chapter 36, CJP § 5–603 was amended to "omit [a] comma, extraneous words, and extraneous comma in § 5–603(b)(2) and (3) of the Courts and Judicial Proceedings Article."

14. We note that Md. Ann.Code, Art. 1, § 15 provides: "Unless such a construction would be unreasonable, the word person shall include corporation, partnership, business trust, statutory trust, or limited liability company." The Court of Appeals has stated, however, "[t]he only caveat to this rule of interpretation which this Court has expressed is that the construction specified in § 15 may not override legislative intent." *In re H.*, 293 Md. 295, 302, 443 A.2d 594 (1982); *State Tax Com. v. Harrington*, 126 Md. 157, 168, 94 A. 537 (1915) ("[A]lthough the rule is to be followed in some cases it cannot override the clear intention of the Legislature." (citing *Shehan v. I. Tanenbaum, Son & Co.*, 121 Md. 283, 285–86, 88 A. 146 (1913)) ("There are many cases in which the Legislature does not mean that the word person shall include corporations. This is always a question of intention, and the intention must be sought for and determined in each case by the aid of the context, the general scope and purpose of the Act and other pertinent considerations.")). In the instant case, the legislative intent overrides this rule of construction. It apparent from the legislative history that

in 1982, in House Bill 1872, Chapter 775, the General Assembly carved out two types of corporate entities for which immunity would be provided—(1) "A volunteer fire department, ambulance and rescue squad whose members have immunity" and (2) "A corporation when its fire department personnel are immune under paragraph (2) of this subsection." At no point did the General Assembly seek to include private commercial ambulance companies or corporations. A review of the legislative history clearly demonstrates that the Good Samaritan Act does not provide immunity to private commercial ambulance companies.

### (3) Relevant Case Law

Relevant case law supports the conclusion that private commercial ambulance companies are not protected from civil liability under the Good Samaritan Act. The few cases addressing applicability of the Good Samaritan Act demonstrate that the Act applies to persons, not corporate entities like appellees. In *Tatum*, 80 Md.App. at 562, 565 A.2d 354, this Court held that a "salaried emergency medical technician" of the Prince George's County Fire Department was immune under the Good Samaritan Act. In *McCoy v. Hatmaker*, 135 Md.App. 693, 705, 763 A.2d 1233 (2000), we affirmed the grant of summary judgment in favor of an ambulance paramedic employed by Baltimore City and a Baltimore City police officer on the basis of the Good Samaritan Act "because Maryland law affords them immunity from civil damages in the absence of gross negligence or willful misconduct." We know of no reported Maryland appellate authority extending immunity to a private commercial ambulance company, or to any company or corporation, under the Good Samaritan Act.

the General Assembly sought to protect individuals from civil liability and carved out only two exceptions in which certain corporations or companies were to enjoy immunity. By plain language, interpreting the word "person" in subsection (a) of the Act to include a corporation would be unreasonable in light of subsection (b) of the Act. Subsection (b) of the Act specifically states that subsection (a) applies to "an individual," "a member," or certain designated corporations.

For the reasons set forth above, we hold that the Good Samaritan Act does not apply to private commercial ambulance companies. As such, we need not address the parties' other contentions as to the Act's applicability.

### III.

Appellants contend that the circuit court erred in granting appellees' Motion for Summary Judgment as appellees are neither a fire nor a rescue company as described in the Fire and Rescue Act, CJP § 5–604. Appellants argue that CJP § 5–604 is inapplicable to the circumstances of this case given the plain and obvious meaning of the statutory language. Appellants contend that the legislative history of CJP § 5–604 demonstrates that the statute is inapplicable because the General Assembly intended CJP § 5–604 to protect fire departments, not private commercial ambulance companies, such as appellees, acting in a situation that did not involve a rescue or an emergency.

Appellees respond that the circuit court properly granted summary judgment in their favor on the ground that they are immune from civil liability as a "rescue company" under CJP § 5–604. Appellees contend that all of the factors contained in CJP § 5–604 necessary to establish immunity are satisfied, as there was no willful or grossly negligent act, TransCare Maryland, Inc. is a rescue company, and the act or omission occurred in the course of TransCare Maryland, Inc. performing its duties. Specifically, as to the second factor of CJP § 5–604, appellees contend that an ambulance company satisfies the definition of a rescue company for purposes of CJP § 5–604, and that whether or not the ambulance company acts for profit is irrelevant.[15] Upon review of the plain language of CJP § 5–604, its legislative history, and relevant statutes and case law, we disagree.

---

**15.** Appellants acknowledged at oral argument that there is no dispute as to the first and third factors under CJP § 5–604.

## (1) **Plain Language**

■ The issue in this case is whether appellees are protected from civil liability under CJP § 5–604, titled "Fire and rescue companies," and, as a result, are entitled to summary judgment. CJP § 5–604 contains no definition of the term "rescue company" and Maryland appellate courts have not addressed the issue.[16]

CJP § 5–604 provides immunity from civil liability to members of fire and rescue companies and to the companies themselves for any act or omission performed in the course of their duties, unless the act or omission is willful or grossly negligent. CJP § 5–604 provides, in pertinent part, as follows:

> (a) Immunity from civil liability.—Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.

A review of the plain meaning of the terms within CJP § 5–604 supports the conclusion that a private commercial ambulance company does not satisfy the definition of the term "rescue company." Black's Law Dictionary 1333 (8th ed. 1999), defines "rescue" as: "The act or an instance of saving or freeing someone from danger or captivity." Merriam–Webster's Collegiate Dictionary 1059 (11th ed. 2003), defines "rescue" as follows:

> [T]o free from confinement, danger, or evil: save, deliver: as
>
> a: to take (as a prisoner) forcibly from custody
>
> b. to recover (as a prize) by force

---

16. Appellees specifically contend that as an ambulance company, they are a "rescue company," but make no argument as to being a fire company. To be sure, in their brief, appellees stated that they "did not contend that TransCare constitutes a 'fire company.' " **(31)** Hence, we will not address that issue.

c: to deliver (as a place under siege) by armed force

\* \* \*

*syn* RESCUE, DELIVER, REDEEM, RANSOM, RECLAIM, SAVE

\* \* \*

SAVE may replace any of the foregoing terms; it may further imply a preserving or maintaining for usefulness or continued existence <an operation that *saved* my life>.

An ambulance is defined as "a vehicle equipped for transporting the injured or sick." Merriam–Webster's Collegiate Dictionary 39 (11th ed. 2003). To conclude that an ambulance company by definition is a "rescue company" would distort the plain meaning of the words.

To the extent appellees contend that under CJP § 5–604 no distinction is made between volunteer and for-profit or public and private rescue companies, they are correct. The statute, by its plain language, does not exempt private or commercial rescue companies from immunity. The requirement, however, is that the entity in question be a fire or rescue company. A private commercial ambulance company, or any company that is not a rescue or fire company is not afforded immunity under the plain language of the statute.

Although the question arises as to whether an ambulance company performing the duties of a rescue company is afforded immunity, we need not answer this question. The statute does not by its plain meaning provide immunity to any company or entity performing rescue duties. The statute requires both—that the company be a fire or rescue company **and** that the alleged acts or omissions be in the course of the company or their personnel performing their official duties. Thus, it is not necessary that we determine whether appellees were performing the duties of a rescue company.[17] It is enough to

---

**17.** If we were to address the issue, based upon the record before us, we would conclude that appellees were not performing the duties of a rescue company. Appellees were not providing transportation at all. According to appellees, Barbour was present for purposes unrelated to Bryson's care or any alleged emergency—paramedic training. In other

conclude, for all of the reasons above, that under a plain language analysis, CJP § 5–604 does not provide immunity to a private commercial ambulance company that is neither a fire nor rescue company.

### (2) Legislative History

In 1964, Subsection (a) of Health Article, 43 § 149A of the Maryland Annotated Code (1957/1965 Repl.Vol.) titled "Liability for civil damages of physicians, nurses and members of volunteer ambulance and rescue squads," provided:

(a) A physician licensed to practice medicine by the Board of Medical Examiners of the State of Maryland, who, in good faith, renders medical aid, care, not in a hospital, and assistance for which the physician received no fee or compensation, at the scene of an accident, shall not be liable for any civil damages as the result of any professional acts or omissions by him, not amounting to gross negligence, in rendering such aid, care, and assistance. The physician shall have a defense against any action, not amounting to gross negligence, for negligence or malpractice brought against him because of any professional acts or omissions in the rendering of such care, aid and assistance.

In 1964, in Senate Bill 43, Chapter 48, the Senate proposed amending Md. Ann.Code, Health 43 § 149A (1957/1965 Repl. Vol.) to include the following subsection:

(b) The members of volunteer ambulance and rescue squads shall not be liable for damages as provided in subsection (a) except for gross negligence, and shall have the defense provided therein, except for gross negligence. In order to be eligible for the exemption from liability provided in this section, a person must have completed a basic course of instruction in first aid, and must be on active duty as a

---

words, Barbour was aboard the aircraft of another—PHI Air Medical— for training to benefit himself and appellees. Bryson was electively intubated and his transfer to UMMS was planned. As such, the transfer was neither unforeseen nor unexpected. For these reasons, we find no merit in the contention that Barbour committed an act or omission in the performance of the duties of a rescue company.

member of a volunteer ambulance and rescue squad which (1) is bona fide and permanent organizations, and (2) is organized and operated as a nonprofit group.

The Senate explained the purpose of the amendment as follows:

> AN ACT to repeal and re-enact, with amendments, Section 149A of Article 43 of the Annotated Code of Maryland (1963 Supplement), title "Health", sub-title "Practitioners of Medicine", to provide UNDER CERTAIN CIRCUMSTANCES that members of CERTAIN volunteer ambulance and rescue squads shall not be liable for civil damages for medical aid, care and assistance rendered at an accident, with exceptions, and providing a defense to units arising out of services rendered at an accident.

Pursuant to Senate Bill 43, Chapter 48, the act took effect June 1, 1964.[18]

In 1983, in Senate Bill 731, Chapter 546, the Senate proposed amending CJP § 5–309.1 (1980 Repl. Vol./1982 Supp.).[19] The purpose of the amendment was stated as follows:

> FOR the purpose of providing that fire and rescue companies and their personnel are immune from civil liability for any act or omission during the course of performing their duties, except for any willful or grossly negligent act; waiving immunity in certain cases; providing for limits on liability in cases where immunity is waived; and generally relating to civil liability of fire and rescue companies and their personnel.

(Alteration in original). Pursuant to Senate Bill 731, Chapter 546, the act was to take effect July 1, 1983. CJP § 5–309.1

------

18. In 1982, the statute was recodified from the Health Article to CJP § 5–309.

19. At some point between 1964 and July 1, 1983, prior to Senate Bill 731, the statute was amended to delete "members of volunteer ambulance and rescue squads shall not be liable" and to include "[a] volunteer fire company is immune."

was amended by Senate Bill 731, Chapter 546, in pertinent part, as follows:

A VOLUNTEER FIRE COMPANY IS IMMUNE FROM LIABILITY IN THE SAME MANNER AS A LOCAL GOVERNMENT AGENCY FOR ANY ACT OR OMISSION IN THE COURSE OF PERFORMING ITS DUTIES IF:

THE ACT OR OMISSION IS NOT ONE OF GROSS NEGLIGENCE

(A) NOTWITHSTANDING NOTWITHSTANDING ANY OTHER PROVISION OF LAW, EXCEPT FOR ANY WILLFUL OR GROSSLY NEGLIGENT ACT, A FIRE COMPANY OR RESCUE COMPANY, AND THE PERSONNEL OF A FIRE COMPANY OR RESCUE COMPANY, ARE IMMUNE FROM CIVIL LIABILITY FOR ANY ACT OR OMISSION IN THE COURSE OF PERFORMING THEIR DUTIES.

(Alterations in original).

The File of the Senate Judicial Proceedings Committee on Senate Bill 731 of the 1983 Session of the General Assembly contains a report titled "Part II: Summary of Committee Report," which states as follows:

BACKGROUND:

The proponents of the bill testified that few people would volunteer to serve the fire departments, if they realized that they could be subject to liability for their acts.

A particular problem for several volunteer fire companies in Montgomery County is that they are not considered to be governmental entitles, and are therefore liable to suit. *Utica Mutual Insurance Company, Etc. v. Gaithersburg–Washington Grove Fire Department Inc.* [, 53 Md.App. 589, 455 A.2d 987 (1983) ].[20]

---

**20.** Addressing the prospective applicability of CJP § 5–309, the Court of Appeals in *Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.,* 308 Md. 556, 569, 520 A.2d 1319 (1987), explained:

*LEGISLATIVE INTENT:*

> This bill intends to protect fire and rescue companies from liability with respect to civil actions that do not involve willful or grossly negligent acts, or the negligent operation of a motor vehicle.

The File of the Senate Judicial Proceedings Committee on Senate Bill 731 of the 1983 Session of the General Assembly also specifically provided that the statute be amended, in pertinent part, by striking the word "Volunteer," and after "Fire" inserting the words *"and Rescue."* [21]

In *Chase*, 360 Md. at 126, 756 A.2d 987, the Court of Appeals discussed the legislative history of CJP § 5–604. The Court interpreted CJP § 5–604 as follows:

> [F]rom the standpoint of statutory construction, it is important that the statute started with a narrow focus-to exempt volunteer fire companies-and ended worded much more broadly-referring simply to "a fire company or rescue company, and the personnel of a fire company or rescue compa-

---

The file of the Senate Judicial Proceedings Committee on S.B. 731 reflects that the legislation was a response to *Utica Mutual Insurance Co. v. Gaithersburg–Washington Grove Fire Department, Inc.,* 53 Md. App. 589, 455 A.2d 987, *cert. denied,* 296 Md. 224 (1983). *Utica Mutual* was a negligence action brought by a fire insurance company, as subrogee of its insured, against a fire company for alleged negligence in failing properly to extinguish a fire which later reignited leading to a second fire. The circuit court had held that the fire company enjoyed governmental immunity but the Court of Special Appeals reversed, holding that whether a fire company enjoyed governmental immunity was a question of fact on which the fire company in *Utica Mutual* had failed to produce sufficient evidence. The intermediate appellate court decided *Utica Mutual* on February 2, 1983, and on February 3, 1983, a member of the Maryland Senate requested the Department of Legislative Reference to prepare a bill granting immunity to volunteer firefighters. As introduced the bill provided that "[a] volunteer fire company is immune from liability in the same manner as a local government agency for any act or omission in the course of performing its duties if [ ] the act or omission is not one of gross negligence...." [ ] The bill was amended in the course of passage to its present form.

**21.** Section 9, Chapter 14, Acts 1997, approved Apr. 8, 1997, and effective from date of enactment, recodified § 5–309.1 to CJP § 5–604 in its present form.

ny." That most emphatically supports the argument that the petitioners make, that the Legislature, by enacting the statute, intended to immunize all fire and rescue companies and their personnel and that immunization is "from civil liability for any act or omission in the course of performing their duties." In point of fact, the statute in this regard is quite clear and unambiguous. Reading the statute reveals not a bit of ambiguity as to the scope of its reach and, giving the words of the statute their ordinary meaning, as we are required to do ... The statute is rendered even clearer when it is recalled that the Legislature knows how to differentiate between voluntary fire companies and municipal fire companies and has done so clearly whenever that is what it intended. See Maryland Code (1973, 1998 Repl.Vol., 1999 Cum.Supp.) § 5–603 of the Courts and Judicial Proceedings Article.

(Some internal citations omitted).

In *Chase,* 360 Md. at 132–33, 756 A.2d 987, the Court of Appeals addressed immunity for individuals under CJP § 5–604 and stated as follows:

The breadth of § 5–604 can not be questioned; it specifically states that it applies to "any act or omission [of a fire or rescue company, or their personnel] in the course of performing their duties." Nor is there any doubt as to who falls within its grant of immunity. The statute clearly and unequivocally refers to fire or rescue companies; there is no differentiation at all between public and private companies. Indeed, as we have seen, the statute started with that limitation, at its introduction it applied only to volunteer companies, but ended without it, indicating the Legislature's intention, arrived at during the passage of the legislation through the General Assembly, to broaden its coverage.

Although the legislative history of CJP § 5–604 and the broad focus of its clear and unambiguous language supports the proposition that the statute is applicable to fire and rescue companies regardless of whether they are volunteer, municipal, or for profit, nothing in the legislative history demon-

strates an intent to extend immunity to private commercial ambulance companies.

### (3) Relevant Statutes and Case Law

Relevant statutes and case law support the conclusion that a private commercial ambulance company is not protected from civil liability under CJP § 5–604. As noted above, CJP § 5–604 contains no definition of the term "rescue company," however, provisions of the Maryland Code and the Code of Maryland Regulations ("COMAR") provide distinct definitions for "commercial ambulance companies" and "fire and rescue companies" in different contexts. We shall look to these statutes and regulations for guidance. COMAR 11.17.20.02(B)(6),[22] defines "fire and rescue organization" as "a Maryland fire department, rescue squad, emergency medical services unit, or volunteer fire company that is authorized to operate emergency vehicles for fire and rescue purposes."

Md.Code Ann., Ed. Art. § 13–515,[23] entitled "Ambulance Service" provides that the term: " 'Ambulance services' does not include the transporting of individuals in an ambulance owned, operated, or under the jurisdiction of a unit of State government, a political subdivision of the State, of a volunteer fire company or volunteer rescue squad."

COMAR 30.09.01.02(B)(13) [24] provides that:

(a) "Commercial ambulance service" means an individual, firm, partnership, limited liability company, corporation,

---

**22.** This definition of "fire and rescue organization" is part of the definition section of Title 11 of COMAR, entitled Department of Transportation. The definition section is part of Subtitle 17, entitled Motor Vehicle Administration—Driver Licensing and Identification Documents. This definition is used in defining emergency vehicles and the requirements for certain license exemptions.

**23.** This definition of "Ambulance service" is used in the Education Code, in Title 13 pertaining to the University of Maryland and Emergency Medical Services.

**24.** This definition of "commercial ambulance service" is part of the definition section in Title 30 of COMAR regarding the Maryland Institute for Emergency Medical Services Systems.

association, or organization engaged in the business of transporting, by ambulance, individuals who are sick, injured, wounded, or otherwise incapacitated.

(b) "Commercial ambulance service" does not include transporting individuals in an ambulance owned by, operated by, or under jurisdiction of a unit of State government, a political subdivision of the State, a volunteer fire company, a volunteer ambulance company, or a volunteer rescue squad or other jurisdictional EMS operations program recognized by the EMS board.

These definitions demonstrate that a commercial ambulance company has not been defined in the Maryland Code or COMAR as a fire or rescue company, and lead us to conclude that a commercial ambulance company is not a fire or rescue company under CJP § 5-604.

Md.Code Ann., Pub. Safety § 8-102 [25] provides that State money can be used for "fire or rescue equipment, including ambulances[,]" thereby indicating that an ambulance may be considered fire or rescue equipment for the allocation of State funds. *Id.* This statute does not address the issue of whether a private commercial ambulance company is a fire and rescue company under CJP § 5-604. The statute merely permits State money to be used for rescue or fire equipment, including ambulances. Sound logic dictates that because the General Assembly deemed it necessary to specify the provision of State money for ambulances, the General Assembly was aware that ambulances are not encompassed by the definition of fire and rescue equipment.

We discern no support in relevant case law or statutes for the proposition that a private commercial ambulance company is a fire or rescue company. In *McCoy*, 135 Md.App. at 705, 763 A.2d 1233, we affirmed the grant of summary judgment in favor of the defendants, including an ambulance paramedic employed by Baltimore City, holding that "Maryland law

---

25. This section of the Public Safety Article discusses the Senator William H. Amoss Fire, Rescue and Ambulance Fund.

afford[ed] them immunity from civil damages in the absence of gross negligence or willful misconduct." We concluded that Maryland law—through the Good Samaritan Act and the Fire and Rescue Company Act-provides immunity to "fire, rescue, and law enforcement personnel from civil damages for errors and omissions made while acting in the scope of their duties." *Id.* In *McCoy,* 135 Md.App. at 701, 763 A.2d 1233, Hatmaker, a Baltimore City ambulance paramedic, responded to a call to provide emergency assistance to McCoy, whom he concluded was dead and not a viable candidate for resuscitation. McCoy's widow brought suit alleging that Hatmaker was grossly negligent and therefore not immune under CJP § 5–603 or CJP § 5–604. *McCoy,* 135 Md.App. at 703–04, 763 A.2d 1233. In reviewing Hatmaker's immunity under the Fire and Rescue Company Act, we concluded that the Act "ensures that members of fire and rescue companies, like Hatmaker, 'are immune from civil liability for any act or omission in the course of performing their duties,' except for those acts that are willful or grossly negligent." *McCoy,* 135 Md.App. at 705, 763 A.2d 1233 (quoting CJP § 5–604(a)). The issue before this Court was whether Hatmaker's conduct constituted gross negligence under CJP § 5–604. We specifically noted that McCoy's widow conceded that the immunity provisions of CJP § 5–603 and CJP § 5–604 applied, absent a willful or grossly negligent act. *McCoy,* 135 Md.App. at 704–05, 763 A.2d 1233. As such, we did not address whether Hatmaker was employed by a fire or rescue company given his status as an employee of the city department responsible for responding to emergencies.

In *Chase,* 360 Md. at 123, 756 A.2d 987, the Court of Appeals held that CJP § 5–604 applied to municipal fire and rescue departments and their employees, as well as to volunteer fire and rescue companies and their employees. The Court of Appeals found that whether a fire or rescue company is public or private is irrelevant to CJP § 5–604's application, but did not define the term "rescue company." *Id.* To be sure, the Court stated there is no differentiation between public and private companies. Again, the threshold requirement is that

the entity be a fire or rescue company. In *Chase,* the employer was the Baltimore City Fire Department. One of the petitioners was an emergency medical technician, a paramedic, employed by the Fire Department. *Id.* at 123, 756 A.2d 987. The Court of Appeals was not confronted with the question of whether or not the employer was a rescue company. As such, the Court was not required to explore the definition of the term "rescue company," and most certainly did not address the issue of whether a private commercial ambulance company is a rescue company. Under the circumstances of the cases, contrary to appellees' position, the proposition that private commercial ambulance companies are covered by CJP § 5–604 is not implicit in the *Hatmaker* and *Chase* opinions, nor do the opinions provide any guidance on the issue.

Appellee's argument that CJP § 5–604 is applicable because there was an emergency is without merit.[26] Paramountly, the statute does not require the existence of an "emergency" as a prerequisite for its applicability. The clear language of the statute provides that for immunity, fire or rescue companies must not commit a willful or grossly negligent act and must be performing "their duties," which could include a vast number of activities outside of a rescue, emergency, or fire. *See Kovatch Mobile Equip. Corp. v. Frederick County Maint. Dep't and Frederick County Bd. of Comm'rs,* 62 Va. Cir. 52, 54, 2003 WL 21382434 (Va.Cir.Ct.2003) (applying Maryland law) (The Circuit Court of the City of Roanoke, Virginia held that "[m]odifications, alterations, maintenance, or otherwise, made on a fire truck's battery system, drive system, engine, or otherwise, are all clearly included within the potential duties of a fire department, particularly if a broad construction is applied [to CJP § 5–604]."). Given that the existence of an

---

**26.** In their brief, appellees state they "rely on precedent establishing the applicability of the act to private rescue companies, ... and in the absence of a statutorily provided definition of rescue company, submit that personnel of an ambulance company participating in an emergency response, such as that of Bryson Murray's mid-air respiratory distress, constitutes a rescue company."

emergency is not a requirement of CJP § 5–604, to hold that appellees are immune under CJP § 5–604 would afford, for example, private commercial ambulance companies engaged in routine patient transfers such as transferring a patient from a hospital to a nursing home, immunity from civil liability under the Act. This would not be a salutary result.

Most conspicuously, however, it is evident from the record and the circumstances surrounding Bryson's intubation that appellees were not responding to a medical emergency. Bryson was electively intubated, by staff with knowledge that Easton Memorial was unable to care for Bryson once the procedure was completed and that Bryson would need to be transported to another facility. Bryson's condition prior to transport was not described in the record as one requiring emergency assistance. In the Complaint filed on February 6, 2009, appellants described the incident, in pertinent part, as follows:

> An evaluation by the Emergency Department physician revealed that Bryson had tachycardia, bilateral rhonchi, and diffuse wheezing. Due to the degree of Bryson's respiratory distress, and as a precautionary measure, at 7:35 p.m. he was electively intubated. As Easton Memorial Hospital is not equipped to manage children that are intubated, Bryson had to be transferred to a hospital that could safely and effectively manage his care.

> A call made to University of Maryland Express Care found that there was an available bed in the University of Maryland Medical System Corporation ("UMMSC") Pediatric Intensive Care Unit. UMMSC agreed to accept Bryson and to send a Pediatric Transport Team to bring Bryson to UMMSC.

> * * *

> The Team arrived at Easton Memorial Hospital at or about 11:30 p.m., received reports from Easton's Health Care Providers, and took over Bryson's care and treatment.

According to appellant, a transport team arrived approximately four hours after Bryson was intubated, only after Easton

contacted UMMS to determine if the hospital could take Bryson.

In this case, appellees and their employee, Barbour, were participating in a training opportunity as PHI Air Medical and employees from PHI Air Medical and UMMS transferred Bryson to UMMS. Barbour was a private commercial ambulance paramedic participating in Bryson's transfer for training purposes, unlike Hatmaker, who was a municipal employee of the city department dispatched to render emergency assistance. *McCoy,* 135 Md.App. at 701, 763 A.2d 1233. There was no genuine dispute of fact as to the nature of appellees' businesses—appellee TransCare Maryland, Inc. acknowledged being a licensed commercial ambulance company.

For all of the reasons set forth above, we conclude, based on a plain language analysis, the legislative history, and relevant case law and statutes, that a private commercial ambulance company is not, by definition, a fire or rescue company entitled to immunity under CJP § 5–604. We hold that appellee, TransCare Maryland, Inc., a private commercial ambulance company, is not a rescue company under CJP § 5–604 and, as such, appellees are not entitled to immunity under the Act.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED AS TO THE TRANSFER. JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED AS TO THE GRANT OF SUMMARY JUDGMENT. CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**