64 A.3d 887

**TRANSCARE MARYLAND, INC., et al.**

v.

**Bryson MURRAY, et al.**

**No. 24, Sept. Term, 2012.**

Court of Appeals of Maryland.

April 22, 2013.

226

Robert W. Goodson, (Kathleen H. Warin and Christine M. Costantino of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Washington, D.C.), on brief, for Petitioners.

Jesse E. Cox and Jason A.L. Timoll, (Stephen L. Snyder and Michael B. Snyder of Snyder & Snyder, Baltimore, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, McDONALD and ALAN M. WILNER (retired, specially assigned) JJ.

McDONALD, J.

In the parable of the Good Samaritan, a man on the way from Jerusalem to Jericho is robbed, beaten, and left for dead. Two passers-by of significant social and religious status see the injured man, but choose to cross to the other side of the road. A third traveler of less repute, a Samaritan, comes to the man's aid, takes him to an inn, tends to him through the night, and then pays the innkeeper the next morning to continue the man's care.

We do not know from the parable whether the fear of civil liability discouraged the first two passers-by from intervening.

In modern-day Maryland, a State law known as the Good Samaritan Act seeks to remove that disincentive, particularly for individuals who have the knowledge and skills to provide useful medical assistance at an emergency, by granting those individuals immunity from liability should something go awry. In some instances that immunity extends to an entity when its personnel provide emergency aid.

Another source of immunity—sovereign immunity—derives from the ancient tenet that "the King can do no wrong." [1] Public agencies and employees, including first responders, have long enjoyed a broad qualified immunity from liability as an aspect of sovereign or governmental immunity. A State statute, popularly known as the Fire and Rescue Act, extends similarly broad immunity to fire companies, rescue companies, and their personnel for "any act or omission in the course of performing their duties."

These two statutes—the one potentially applicable to a broad class of actors but focused on emergency situations, the other applicable to a narrower class but broader in the scope of the immunity it confers—provide overlapping protection to some extent. This case concerns whether one, or both, of these statutes necessarily relieves a commercial ambulance company of liability for the allegedly negligent actions of one of its employees in providing assistance to a patient when an emergency arose while the employee was in training. We hold that they do not.

### Background

*The Transport of Bryson Murray*

On November 15, 2007, Respondent Bryson Murray,[2] a minor who was suffering from congestion and was having trouble breathing, was taken to Easton Memorial Hospital

---

1. *Katz v. WSSC,* 284 Md. 503, 507, 397 A.2d 1027 (1979).

2. We will refer to Bryson Murray in this opinion by his first name to distinguish him from his mother, Karen Murray, who is also a Respondent in this case. We will refer to them collectively as "the Murrays."

("Easton Memorial") in Talbot County.[3] At the hospital he was fitted with an endotracheal breathing tube. Because Easton Memorial was not equipped to handle intubated children, hospital officials sought to transfer him to the pediatric intensive care unit at the Medical Center of the University of Maryland Medical System ("UMMS") in Baltimore.

UMMS arranged for PHI Air Medical to carry out the transport by helicopter. Present on the helicopter was a flight paramedic team that included a UMMS pediatric intensive-care nurse, a PHI flight paramedic, and a PHI flight nurse. Also present was Chris Barbour,[4] a paramedic employed by Petitioner TransCare [5] who had been invited to ride along by the UMMS nurse (with PHI's permission) for orientation purposes. TransCare, a licensed commercial ground ambulance transport company, was under contract with UMMS to provide ground ambulance services for patients between the Medical Center and area hospitals.[6] Mr. Barbour was a licensed emergency medical technician-paramedic.

After the helicopter arrived at Easton Memorial, Mr. Barbour set up equipment and the team placed Bryson on the aircraft. Shortly after take-off, however, Bryson's heart rate and oxygen blood level began to drop, because, according to the allegations in the complaint, the endotracheal tube had become dislodged and was blocking his airway. Members of the flight team searched for a pediatric air mask to restore

---

**3.** This background is drawn from the allegations in the complaint that initiated this action, as well as other undisputed facts established in the record.

**4.** The complaint spells the last name as "Barber." In their briefs, the parties have consistently spelled the name as "Barbour," which we presume to be the correct spelling.

**5.** We use the designation "TransCare" to refer collectively to TransCare Corporation and its subsidiary TransCare Maryland, Inc., both of which were named as defendants in the complaint and both of which are Petitioners in this Court.

**6.** TransCare does not operate helicopters or typically employ personnel to participate in air medical transportation.

Bryson's breathing, but were unable to locate it. The helicopter then landed at Bay Bridge Airport in Stevensville, where the flight paramedic retrieved the mask from its storage compartment and Bryson was reintubated. Bryson's cardiac activity returned to normal and the helicopter completed its trip to the Medical Center.

*The Murrays' Negligence Action*

*Complaint*

Bryson, by his mother, Karen Murray, subsequently filed a complaint against TransCare alleging medical malpractice on the basis that its employee, Mr. Barbour, had failed to provide the requisite standard of care and that TransCare was vicariously responsible under the principle of *respondeat superior.*[7] According to the complaint, Bryson suffered hypoxic brain injury due to alleged acts and omissions of Mr. Barbour during the helicopter transport and, as a result, is blind, deaf, and mentally disabled. The complaint did not name Mr. Barbour individually as a defendant.[8]

*Summary Judgment Motion*

TransCare moved for summary judgment, arguing that it was immune from liability under both the Good Samaritan Act and the Fire and Rescue Act. The Circuit Court for Talbot County[9] was initially persuaded that there were disputes of

---

7. This Court has recently described the doctrine of *respondeat superior:*
 Litigants may invoke the doctrine of *respondeat superior* as a means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time. On a successful claim under the doctrine of *respondeat superior,* an employer will be held jointly and severally liable for the tortious acts committed by its employee. For an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer.
 *S. Mgmt. Corp. v. Taha,* 378 Md. 461, 480–81, 836 A.2d 627 (2003).

8. The Murrays had earlier also asserted claims against PHI Air Medical and UMMS, which had been resolved by the time the complaint was filed.

9. The complaint was initially filed in the Circuit Court for Baltimore City but, upon motion by TransCare, was transferred to the Circuit

material fact as to TransCare's corporate relationship with the other medical providers involved and as to whether it had received a "fee or compensation" that would preclude application of the Good Samaritan Act. The Circuit Court also tentatively concluded that the Fire and Rescue Act did not apply to a commercial ambulance company such as TransCare. Accordingly, the Circuit Court initially denied TransCare's motion for summary judgment based on those immunity provisions.

TransCare thereafter filed a motion for reconsideration, submitting two affidavits that established the company's independent corporate status and described its billing practices. Following a hearing on that motion, the Circuit Court concluded that there were no remaining disputes of material fact and that TransCare was immune under both the Good Samaritan Act and the Fire and Rescue Act. It therefore granted summary judgment in favor of TransCare.

*Appeal*

The Murrays appealed and the Court of Special Appeals reversed, holding that neither statute applied to a private, for-profit ambulance company. 203 Md.App. 172, 37 A.3d 987 (2012). TransCare petitioned this Court for certiorari. We granted the petition to determine whether either the Good Samaritan Act or the Fire and Rescue Act relieves a commercial ambulance company of civil liability for the alleged negligence of an employee committed when an emergency arises during a transfer of a patient between medical facilities.[10]

## Standard of Review

■■ Whether summary judgment was properly granted is a question of law; we review the Circuit Court's decision to determine whether it was legally correct. *Walk v. Hartford*

---

Court for Talbot County on the ground that the latter court was the more appropriate venue under the doctrine of *forum non conveniens.*

10. The Court of Special Appeals also affirmed the decision to transfer the case from Baltimore City to Talbot County. 203 Md.App. at 187–97, 37 A.3d 987. That ruling is not before us.

*Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98 (2004). Like the Circuit Court, we view the record in the light most favorable to the non-moving party to ascertain whether there is a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Jurgensen v. New Phx. Atl. Condo. Council of Unit Owners*, 380 Md. 106, 114, 843 A.2d 865 (2004).

## Analysis

 In order to assess TransCare's claims of immunity, we must construe two statutes—the Good Samaritan Act and the Fire and Rescue Act. This Court has frequently reiterated the principles that guide statutory interpretation, which we summarize as follows:

- give effect to legislative intent
- look first to the "ordinary, plain meaning" of the language
- do not add or delete language
- do not apply forced or subtle interpretations
- keep in mind the statutory context
- consider the purpose, aim, or policy of the Legislature
- avoid constructions inconsistent with common sense
- presume that each section is to work harmoniously with others

*See, e.g., Willis v. Montgomery County*, 415 Md. 523, 536–37, 3 A.3d 448 (2010).

### *Whether TransCare Has Immunity under the Good Samaritan Act*

#### *Good Samaritan Laws*

Under the common law, there is no general duty to provide assistance to those in peril. *See* Prosser, Law of Torts (4th ed.1971) § 56 at 340–43 ("the law has persistently refused to recognize the moral obligation, of common decency and common humanity, to come to the aid of another human being who is in danger . . ."). Moreover, under general principles of tort

law, one who voluntarily chooses to aid another owes that person a duty of care; a failure to exercise such care may result in legal liability. *See Remsburg v. Montgomery,* 376 Md. 568, 589–90, 831 A.2d 18 (2003); *see also* 57A Am.Jur.2d *Negligence* § 104 (2012); Restatement 2d of Torts, §§ 323, 324. This risk of potential liability led to the unsatisfactory result that health care professionals capable and willing to provide emergency medical services had (in theory, at least) a disincentive to do so. *See* Silver, *The Duty to Rescue: A Reexamination and Proposal,* 26 Wm. & Mary L.Rev. 423, 428 (1985).

Beginning in California in 1959,[11] legislatures in every state enacted laws designed to eliminate this disincentive and to encourage medical professionals (and, often, volunteers in general) to provide emergency assistance by granting them immunity from liability for ordinary negligence. Silver, *supra,* 26 Wm. & Mary L.Rev. at 427–28. The Maryland General Assembly first enacted such a statute in 1963. Chapter 65, Laws of Maryland 1963. From the outset, such laws have generally been labeled the "Good Samaritan Act" or "Good Samaritan Law," both in Maryland and elsewhere. *See* Annotation, *Construction and Application of "Good Samaritan" Statutes,* 68 A.L.R.4th 294 (2012); 64 *Opinions of the Attorney General* 169 (1979).

*Maryland Good Samaritan Act*

 Pertinent to this case, the Maryland Good Samaritan Act provides immunity to specified individuals and entities from liability for ordinary negligence that occurs in connection with assistance or medical care rendered without fee or other compensation at the scene of an emergency or in transit to a medical facility.[12] The statute currently provides as follows:

---

**11.** Cal. Bus. & Prof.Code § 2144 (1962), *later recodified as* § 2395 (relieving health care providers rendering emergency aid from the standard duty of care and providing that only those who are wilfully negligent or act in bad faith face liability). *See* Franklin, *Vermont Requires Rescue: A Comment,* 25 Stan. L.Rev. 51, 52 (1972).

**12.** The statute also applies to assistance or medical care provided "through communications with personnel providing emergency assis-

(a) A person described in subsection (b) of this section is not civilly liable for any act or omission in giving any assistance or medical care, if:

(1) The act or omission is not one of gross negligence;

(2) The assistance or medical care is provided without fee or other compensation; and

(3) The assistance or medical care is provided:

(i) At the scene of an emergency;

(ii) In transit to a medical facility;

(iii) Through communications with personnel providing emergency assistance.

(b) Subsection (a) of this section applies to the following:

(1) An individual who is licensed by this State to provide medical care;

(2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad, or law enforcement agency, the National Ski Patrol System, or a corporate fire department responding to a call outside of its corporate premises, if the member:

(i) Has completed an American Red Cross course in advanced first aid and has a current card showing that status;

(ii) Has completed an equivalent of an American Red Cross course in advanced first aid, as determined by the Secretary of Health and Mental Hygiene; or

(iii) Is certified or licensed by this State as an emergency medical services provider;

(3) A volunteer fire department or ambulance and rescue squad whose members have immunity; and

(4) A corporation when its fire department personnel are immune under paragraph (2) of this subsection.

---

tance," a provision that does not appear to be implicated by the facts of this case. Maryland Code, Courts & Judicial Proceedings Article, CJ § 5–603(a)(3)(iii).

(c) An individual who is not covered otherwise by this section is not civilly liable for any act or omission in providing assistance or medical aid to a victim at the scene of an emergency, if:

(1) The assistance or aid is provided in a reasonably prudent manner;

(2) The assistance or aid is provided without fee or other compensation;

(3) The individual relinquishes care of the victim when someone who is licensed or certified by this State to provide medical care or services becomes available to take responsibility.

Maryland Code, Courts and Judicial Proceedings Article ("CJ") § 5–603.[13] TransCare asserts that it has immunity directly under CJ § 5–603(b)(3) as a "volunteer fire department or ambulance and rescue squad whose members have immunity." In addition, TransCare argues that, regardless of whether CJ § 5–603(b)(3) directly confers immunity on it, it has immunity because its employee, Mr. Barbour, has immunity under the statute.

*CJ § 5–603(b)(3)—Text*

As TransCare is a commercial ambulance company, the application of CJ § 5–603(b)(3) to it depends, in part, on whether the adjective "volunteer" modifies only "fire department" or also modifies "ambulance and rescue squad." If "volunteer" modifies only "fire department," TransCare potentially has immunity as an "ambulance squad" (if its "members" have immunity). If "volunteer" also modifies "ambulance and rescue squad," TransCare does not have immunity under this

---

**13.** In 2008, after the events set forth in the complaint in this case, the Legislature made certain "stylistic" changes in CJ § 5–603(b)(2) and (b)(3) as part of the annual corrective bill. Chapter 36, § 1, Laws of Maryland 2008. In particular, that law deleted the phrase "or of" from before "the National Ski Patrol" in (b)(2), added the word "or" before "law enforcement agency" in (b)(2), and replaced a comma with the conjunction "or" after "volunteer fire department" in (b)(3). Neither party has suggested that these changes have any significance for the decision of this case.

provision (regardless of whether its "members" or employees have immunity). Either construction of the phrase is grammatically correct; in light of this ambiguity in meaning, we resort to the statute's legislative history to discern its purpose.

*CJ § 5–603(b)(3)—Legislative history*

What is now CJ § 5–603(b)(3) was added to the Good Samaritan Act in 1979. Chapter 301, Laws of Maryland 1979.[14] To place it in context, however, we must briefly describe the history of the Good Samaritan Act leading up to that amendment.

When the General Assembly first enacted the Good Samaritan Act in 1963, the statute applied only to physicians who provided free medical assistance at the scene of an accident.[15] The following year, the statute was amended to expand its protection beyond physicians to include "members of volunteer ambulance and rescue squads ... organized and operated as a non-profit group."[16] In 1969, the provision concerning mem-

---

14. The Court of Special Appeals opinion mistakenly attributes what is now CJ § 5–603(b)(3) to a 1982 amendment that added a similar provision relating to corporate fire departments, now codified at CJ § 5–603(b)(4). 203 Md.App. at 207–10, 37 A.3d 987.

15. As originally enacted, the statute read in full:

A physician licensed to practice medicine by the Board of Medical Examiners in the State of Maryland, who, in good faith, renders medical aid, care, not in a hospital, and assistance for which the physician received no fee or compensation, at the scene of an accident, shall not be liable for any civil damages as the result of any professional acts or omissions by him, not amounting to gross negligence, in rendering such aid, care, and assistance. The physician shall have a defense against any action, not amounting to gross negligence, for negligence or malpractice brought against him because of any professional acts or omissions in the rendering of such care, aid and assistance.

Chapter 65, Laws of Maryland 1963 *then codified at* Maryland Code, Article 43, § 149A.

16. A 1964 amendment recodified the 1963 law as subsection (a) of § 149A and added an additional subsection, as follows:

(b) The members of volunteer ambulance and rescue squads shall not be liable for damages as provided in subsection (a) except for gross negligence, and shall have the defense provided therein, except for gross negligence. In order to be eligible for the exemption from

bers of ambulance and rescue squads was amended to include "members or employees" of fire departments; at the same time, the adjective "volunteer" was deleted. Thus, the immunity extended to "members or employees of fire departments or ambulance and rescue squads ... organized and operated as a nonprofit group." Chapter 616, Laws of Maryland 1969. As is evident, although the word "volunteer" had been eliminated by the 1969 amendment, the statute did not apply to members or employees of for-profit organizations.

In 1970, in the course of recodifying the statute, the Legislature returned the adjective "volunteer" to the statute. Chapter 736, Laws of Maryland 1970.[17] Although the Good Samaritan Act was amended in other respects over the next few years, the language concerning members of ambulance and rescue squads was unaffected until 1976.[18] Despite the insertion, deletion, and re-insertion of the word "volunteer" before "ambulance and rescue squads," it remained clear that the

---

liability provided in this section, a person must have completed a basic course of instruction in first aid, and must be on active duty as a member of a volunteer ambulance and rescue squad which (1) is a bona fide and permanent organization, and (2) is organized and operated as a non-profit group.

Chapter 48, Laws of Maryland 1964, *then codified as* Maryland Code, Article 43, § 149A(b). In 1965, the statute was amended to extend immunity to nurses. Chapter 475, Laws of Maryland 1965.

17. The Good Samaritan Act was recodified by the 1970 law as Maryland Code, Article 43, § 132. The provision in question then read:

(b) The members of any fire department or volunteer ambulance and rescue squads shall not be liable for damages as provided in subsection (a) hereof, if the members completed an advanced Red Cross or equivalent course in first aid approved by the Secretary of the Department of Health and Mental Hygiene and are members of any fire department or a volunteer ambulance and rescue squad which (1) is a bona fide and permanent organization and (2) is operated as a nonprofit group.

Maryland Code, Article 43, § 132(b).

18. *See* Chapter 736, Laws of Maryland 1970 (modifying training requirement); Chapter 266, Laws of Maryland 1972 (expanding coverage to members of National Ski Patrol System); Chapter 503, Laws of Maryland 1973 (extending coverage to law enforcement officers); Chapter 346, Laws of Maryland 1974 (extending coverage to persons rendering emergency assistance at airport).

statute did not extend to members or employees of for-profit organizations.

In 1976, the Good Samaritan Act was revised in response to advice from the Attorney General's Office that an amendment of the Act was necessary to ensure that functions carried out under the new State Emergency Medical System were covered by the Good Samaritan Act. *See* Letter of Assistant Attorney General Paul Walter to R. Adams Cowley, M.D. (October 24, 1974). That advice did not suggest that the Act needed to be extended to commercial ambulance companies or other for-profit entities.

The 1976 revision encompassed the entire statute, including the provision concerning members of fire departments and ambulance and rescue squads. In particular, the description of the individuals covered by immunity in that provision was changed from "[t]he members of any fire department or volunteer ambulance and rescue squads ..." to "[a] member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad ..." Chapters 558, 689, Laws of Maryland 1976. The shifting of the adjective "volunteer" within the introductory phrase, however, did not signify an indirect expansion of the immunity provision to members of commercial entities. Rather, it simply ensured that the adjective "volunteer," together with the adjectives denoting government entities, would apply to fire departments as well as ambulance and rescue squads. *See Tatum v. Gigliotti*, 321 Md. 623, 630, 583 A.2d 1062 (1991) (describing the provision as providing immunity for "members of fire departments and ambulance and rescue squads which may be state, county or municipal, as well as volunteer"). That conclusion is confirmed by one of the drafters of the 1976 bill, who told the Legislature that the language of the provision concerning members of fire departments and ambulance and rescue squads was meant simply to restate the existing immunity without substantive change. *See* Testimony of William E. Hathaway (January 29, 1976) ("This paragraph provides the same coverage to firemen, ambulance and rescue personnel

and police as is presently provided in [the Good Samaritan Act]").

The extension of immunity to the entities themselves in addition to their members—what is now CJ § 5–603(b)(3)— was added to this provision three years later.[19] Chapter 301, Laws of Maryland 1979. At that time, the statute provided immunity for members of "any State, county, municipal or volunteer fire department, ambulance and rescue squad" who satisfied certain requirements. Maryland Code, Article 43, § 132(b) (1971 Repl.Vol., 1978 Supp.). As indicated above, this provision had never applied to members of a commercial entity. The Anne Arundel County government requested a bill, which originally would have applied only in Anne Arundel County, to extend that immunity to the organization of which the immune individuals were members—*i.e.,* so that "a volunteer fire department or ambulance and rescue squad has the same immunity as its members." Senate Bill 1031 (1979).

A submission to the Legislature by the Anne Arundel County Executive's office explained the need for the amendment. It indicated that the County had agreed to provide legal representation for all members of volunteer fire departments "and ambulance/rescue squads" in the county. *See* Legislation Submitted by the Anne Arundel County Executive, 1979 General Assembly, copy in legislative file for Senate Bill 1031 (1979). It recounted a recent case in which a volunteer fire department had been named as a defendant in a lawsuit in addition to the firefighter. The County noted that, while the firefighter was clearly immune under the Good Samaritan Act, "[t]he *volunteer* fire department, however, is a private *nonprofit* corporation which does not appear to have the statutory immunity which is bestowed upon its constituent members. We believe the absence of this protection for *the volunteer unit* is not in keeping with the spirit and rationale of

---

**19.** In the interim, the statute had been amended in other respects not directly pertinent to the current issue. *See* Chapter 463, Laws of Maryland 1977 (fixing defect in title of 1976 law); Chapter 140, Laws of Maryland 1978 (returning National Ski Patrol System to statute).

[the Good Samaritan Act] since it has the net effect of discouraging the active participation of *these units* in emergency situations." *Id.* (emphasis added). The bill's geographical limitation to Anne Arundel County was ultimately eliminated, making the amendment applicable statewide. No amendment was made to the substantive language concerning the types of organizations covered by the immunity. The bill was enacted and codified at that time in Article 43, § 132(b).

There is no indication in the language of the 1979 amendment or its legislative history of any intent to extend this protection to commercial ambulance companies. The amendment keyed the immunity of a "volunteer fire department or ambulance and rescue squad" to the immunity of its "members"—an odd term to use if the amendment encompassed the employees of a company with stockholders.[20] While the example given by the county government that proposed the amendment involved a volunteer fire department, it stated that it had agreed to provide legal representation for the members of "ambulance/rescue squads" and its purpose for including those organizations in the bill was the same as stated for the volunteer fire department that had been sued. There is no suggestion in these materials that the county had decided to provide free legal representation to the employees of commercial ambulance companies or was seeking to confer a benefit on those entities. Nor is there any discussion of the potential liability of commercial ambulance companies. It is clear that the legislation was concerned with expanding immunity to volunteer, nonprofit entities to remove a disincentive to the provision of their emergency services. Consistent with this history, a contemporaneous opinion of the Attorney General construed the term "volunteer" in the statute to modify "ambulance and rescue squad." 64 *Opinions of the Attorney General* 175, 176 (1979) (concluding that "the Community

---

**20.** By contrast, the amendment of the Good Samaritan Act three years later that extended its protection to corporations with fire departments refers to the "personnel" of those departments. Chapter 775, Laws of Maryland 1982, *now codified at* CJ 5–603(b)(4).

Rescue Service and its members are covered under § 132(b) as a 'volunteer' . . . ambulance and rescue squad").

After 1979, the Good Samaritan Act was amended in minor substantive respects not pertinent to this case[21] and was recodified as part of the Courts and Judicial Proceedings Article in 1982.[22]

We agree with the Court of Special Appeals that TransCare, as a for-profit ambulance company, does not have immunity under CJ § 5–603(b)(3) regardless of whether Mr. Barbour is personally covered by the Act.

*Whether TransCare as Employer Necessarily Has Same Immunity as its Employee*

TransCare makes a broader argument for immunity under the Good Samaritan Act, untethered to any of the provisions that specifically confer immunity on corporations or other organizations. It asserts that, given that its liability is predicated on the actions of its employee, Mr. Barbour, it cannot be vicariously liable if Mr. Barbour is personally immune under the Good Samaritan Act.[23]

---

**21.** For example, a 1982 amendment extended immunity to members of corporate fire departments—as well as the corporation when the members were immune. Chapter 775, Laws of Maryland 1982.

**22.** Chapter 770, § 4, Laws of Maryland 1982. The statute was originally codified in the Courts & Judicial Proceedings Article as CJ § 5–309. It was later recodified as CJ § 5–603. Chapter 14, § 9, Laws of Maryland 1997.

**23.** TransCare supports this view with its analysis of two Court of Special Appeals decisions. As TransCare concedes, neither of those decisions expressly addresses its theory that an employer necessarily has immunity under the Good Samaritan Act if its employee has immunity. *Chase v. Mayor and City Council*, 126 Md.App. 427, 438, 730 A.2d 239 (1999), *rev'd on other grounds*, 360 Md. 121, 756 A.2d 987 (2000)(denying immunity under the Good Samaritan Act to a paramedic employed by a municipal fire department where the city charged a fee for ambulance service, but stating, "although appellees' argument apparently assumes that the immunities for employer and employee are severable, we decline to consider it further as it is entirely too academic"); *McCoy v. Hatmaker*, 135 Md.App. 693, 763 A.2d 1233 (2000), *cert. denied*, 364 Md. 141, 771 A.2d 1070 (2001) (case dismissed against Baltimore City and employee on the basis of immunity under the Good

■ TransCare's argument is contrary to the general rule on the relationship of employer immunity to that of an employee. As this Court recently stated: "The principal in an agency relationship is not entitled to receive immunity simply because the agent is entitled to receive immunity; the principal must establish an independent basis to receive the benefit of an immunity shield.... [U]nless there is an independent source of immunity for the employer or principal, the cause of action premised on vicarious liability can be brought even if the employee or agent is entitled to immunity." *D'Aoust v. Diamond,* 424 Md. 549, 605–07, 36 A.3d 941 (2012); *see also James v. Prince George's County,* 288 Md. 315, 332, 418 A.2d 1173 (1980)("As a general rule ... the master remains liable for the servant's conduct even though the servant is himself not liable because of a personal immunity").

TransCare attempts to distinguish *D'Aoust* on the basis that it concerned common law immunity rather than statutory immunity. But the Court in *D'Aoust* specifically noted that its conclusion applied "to the concept of immunity generally as it relates to causes of action based on vicarious liability." *D'Aoust,* 424 Md. at 607, 36 A.3d 941. Moreover, in establishing immunity for individuals by statute, the General Assembly may well contemplate that the individual's employer is liable for that individual's conduct. For example, in the Maryland Tort Claims Act, governmental entities may be liable for the negligent actions of an employee even though the Legislature has conferred immunity on the individual employee. *See* Maryland Code, State Government Article, § 12–101 *et. seq.;* CJ § 5–522. Indeed, if, as a general principle, an employee's immunity under the statute relieved the employer of liability, two provisions of the statute that explicitly confer immunity on specified organizations when the members or personnel of the organization have immunity—CJ § 5–603(b)(3) and (b)(4)— would be unnecessary. Thus, we are persuaded that an

Samaritan Act and Fire and Rescue Act without discussion of possible severability).

employer does not necessarily have immunity under the Act simply because its employee has immunity.

*Conclusion*

TransCare is not a volunteer ambulance and rescue squad and therefore does not qualify for immunity under CJ § 5–603(b)(3). Nor is it shielded from liability under the Act for the alleged negligence of Mr. Barbour, regardless of whether he individually has immunity under the statute.[24]

## Whether TransCare Has Immunity under the Fire and Rescue Act

*Fire and Rescue Act—Text*

■ Unlike the Good Samaritan Act, the Fire and Rescue Act confers a broad immunity on certain organizations without predicating that immunity on the immunity of the organization's members or employees. If the statute applies, it provides immunity for both the organization and its personnel. It states:

(a) Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.

(b)(1) The immunity granted by this section is waived with respect to actions to recover damages for the negligent operation of a motor vehicle to the following extent:

(i) For a self-insured fire company or rescue company, liability shall extend up to the minimum insurance limits imposed by § 17–103 of the Transportation Article; and

---

**24.** Accordingly, we need not determine issues related to other conditions for immunity under the Good Samaritan Act—*i.e.,* whether UMMS's payments to TransCare or Mr. Barbour's salary constituted a "fee or other compensation" that would negate immunity or whether a "transit to a medical facility" covered by the Act must occur in response to an emergency. (Nor is there any need to determine whether there was gross negligence that would preclude application of the Act; in any event, the Murrays apparently did not allege gross negligence).

(ii) For a fire company or rescue company insured by an insurer authorized to issue insurance policies in this State, liability shall extend up to the maximum limit of any basic vehicle liability insurance policy it has in effect, exclusive of excess liability coverage.

(2) The immunity granted by this section is not waived and may be raised as a defense as to any amount of damages claimed above the limits in this subsection and as to any other action for damages not involving the negligent operation of a motor vehicle.

CJ § 5–604. The statute thus provides a broad immunity from civil liability for ordinary negligence—with a limited exception related to negligent operation of a motor vehicle— for fire and rescue companies and their personnel. This Court has previously determined that the Fire and Rescue Act was intended to immunize all fire and rescue companies and their personnel: "The statute clearly and unequivocally refers to fire or rescue companies; there is no differentiation at all between public and private companies." *Mayor and City Council v. Chase,* 360 Md. 121, 132, 756 A.2d 987 (2000).

Whether the statute provides immunity to TransCare in this case depends on whether TransCare is properly characterized as a private "fire or rescue company"—or, more precisely, a private "rescue company," as TransCare makes no pretension of being a fire company. There is no definition of that phrase in the statute, nor is its plain meaning in this context self-evident. We look to the history of the statute, as well as the Legislature's creation of similar immunities in other statutes, to discern the General Assembly's purpose in establishing this broad immunity. We also consider related statutes and regulations concerning rescue companies and commercial ambulance companies.

*Fire and Rescue Act—History*

Although the Fire and Rescue Act provides protection similar to that provided by the Good Samaritan Act, it has a separate lineage. The legislative record reveals that the Fire and Rescue Act was intended to confer a governmental-like

immunity on volunteer fire departments and entities performing similar functions.[25]

Under the common law, state and local governments, and their agencies, have sovereign or governmental immunity.[26] *See Condon v. State*, 332 Md. 481, 492, 632 A.2d 753 (1993). For various policy reasons, the General Assembly may choose to waive that immunity by statute, usually to a limited extent and sometimes in conjunction with conferring immunity on State actors or employees.[27] On occasion, a question arises as to whether other organizations that serve a public purpose also partake of sovereign immunity.[28]

In 1983, the Court of Special Appeals considered whether a volunteer fire department was protected by governmental immunities against claims related to allegedly negligent efforts to extinguish a fire. *Utica Mutual Ins. Co. v. Gaithersburg–Wash. Grove Fire Dep't*, 53 Md.App. 589, 455 A.2d 987, *cert. denied*, 296 Md. 224 (1983). The intermediate appellate court answered the question in the negative, finding that there was insufficient evidence in the record that the particular volunteer fire department qualified as a government entity. The court further held that, in any event, the members of the volunteer fire department were not public officials, and thus

---

**25.** The legislative history of the statute was first reviewed by this Court in some detail in *WSSC v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 569–70, 520 A.2d 1319 (1987). *See also Mayor and City Council v. Chase*, 360 Md. 121, 125–26, 756 A.2d 987 (2000); 360 Md. at 138–41, 756 A.2d 987 (Raker, J., dissenting).

**26.** In certain respects, not pertinent to the current discussion, the immunity of local governments is more limited than that of the State. *See Baltimore County v. RTKL*, 380 Md. 670, 675, 846 A.2d 433 (2004).

**27.** *E.g.*, Maryland Tort Claims Act, Maryland Code, State Government Article, § 12–101 *et. seq.;* CJ § 5–522.

**28.** *See, e.g., Harrison v. MVA*, 302 Md. 634, 490 A.2d 694 (1985) (determining whether Maryland Automobile Insurance Fund has sovereign immunity); *Central Collection Unit v. DLD Associates LP*, 112 Md.App. 502, 685 A.2d 873 (1996)(analyzing whether Injured Workers Insurance Fund is an instrumentality of the State for purposes of sovereign immunity).

were not entitled to public official or governmental immunity from negligence claims.[29] Similarly, other courts have held that a non-profit rescue squad in Maryland is a private entity and not a State actor. *Krieger v. Bethesda–Chevy Chase Rescue Squad,* 599 F.Supp. 770, 775 (D.Md.1984), *aff'd,* 792 F.2d 139 (4th Cir.1986).

The day after the *Utica Mutual* opinion was released, a state senator asked legislative staff to draft a bill conferring immunity on volunteer firefighters.[30] The initial version of the bill simply extended local government immunity to volunteer fire companies. As the bill progressed through the Legislature it was rewritten to also include within its scope all fire companies,[31] as well as "rescue" companies and the personnel of fire companies and rescue companies. The revision also elaborated on the bill's broad immunity from liability for ordinary negligence.[32] In particular, it applied to "any act or

---

**29.** The court noted, however, that volunteer firefighters providing emergency assistance or medical care would potentially have immunity under the Good Samaritan Act, which was then codified at CJ § 5–309. 53 Md.App. at 595 n. 5, 455 A.2d 987.

**30.** The Court of Special Appeals opinion mistakenly merges the legislative histories of the Fire and Rescue Act and the Good Samaritan Act, suggesting that the Fire and Rescue Act was first enacted in 1964 and describing it as an offshoot of the Good Samaritan Act. *See* 203 Md.App. at 214–16 & n. 19, 37 A.3d 987. In fact, while the protections from liability provided by the two statutes overlap to some degree, their origins are quite distinct.

**31.** In *Mayor and City Council v. Chase,* 360 Md. 121, 123, 756 A.2d 987 (2000), this Court concluded that the revision of the bill broadened its reach to include "municipal fire and rescue departments and their employees, as well as to volunteer fire and rescue companies and their employees." Similarly, the Attorney General concluded that it would cover an ambulance service run by volunteer firefighters that collected a stipend to cover expenses. *Opinion of the Attorney General,* No. 87–055 (November 17, 1987) (unpublished), 1987 Md AG LEXIS 4.

**32.** The immunity was clearly intended to be broader in scope than that provided by the Good Samaritan Act, which only covered the provision of emergency assistance and medical care and would not, apparently in the appellate court's view in *Utica Mutual,* extend to firefighting. *See Opinion of the Attorney General,* No. 87–055 (November 17, 1987) (unpublished), 1987 Md AG LEXIS 4 at *8 n. 6.

omission [of a fire or rescue company or its personnel] in the course of performing their duties"[33] and stated that the immunity trumped other potentially applicable laws ("[n]otwithstanding any other provision of law . . ."). Proponents of the bill had expressed the concern that, in light of the *Utica Mutual* decision, "few people would volunteer to serve the fire departments, if they realized that they could be subject to liability for their acts." Senate Judicial Proceedings Committee, Hearing Summary for Senate Bill 731 (March 30, 1983). As enacted, the bill resembled the broad immunity applicable to governmental entities—not surprising in light of the bill's purpose to extend (or, in the view of some, restore) such immunity for volunteer fire departments and entities performing similar public functions. Chapter 546, Laws of Maryland 1983. Apart from recodification, the statute remains unchanged since its original passage.[34]

As enacted in 1983, the statute also carved out an exception to the broad immunity that it recognized—an exception for liability arising from the negligent operation of a motor vehicle. See CJ § 5–604(b). This exception was characterized as a "waiver" of immunity[35] and resembled similar exceptions, or waivers, that the Legislature had contemporaneously applied to governmental immunities and immunities related to the provision of emergency services. In particular, the General Assembly had codified or tweaked various governmental-type

---

**33.** The reference to the performance of "duties," instead of "during the course of employment," suggests the performance of a public function and echoes language used in statutes concerning governmental immunity. *See* CJ § 5–522(b)(referring to "scope of public duties" in defining immunity under Maryland Tort Claims Act).

**34.** The statute was originally codified as CJ § 5–309.1. In 1997, it was transferred to a different subtitle with other provisions concerning immunities related to health and public safety and renumbered as CJ § 5–604. Chapter 14, § 9, Laws of Maryland 1997.

**35.** The characterization of this exception as a "waiver"—as opposed to simply part of the definition of the immunity conferred by the statute— is consistent with the notion that the immunity was otherwise all-encompassing and similar to a governmental immunity that pre-exists exceptions created by legislation.

immunities and, at the same time, carved out exceptions or waivers as to each of those immunities for negligent operation of a motor vehicle. *See, e.g.,* CJ § 5–507 (codifying immunity of municipal officials and creating a limited exception for motor vehicle torts up to the limits of motor vehicle insurance) [36]; CJ § 5–524 (creating exception to governmental or sovereign immunity for negligent use of a vehicle in government service up to the limits of motor vehicle insurance) [37]; CJ § 5–511 (codifying immunity of officials of various governmental entities and creating exception related to motor vehicle insurance limits) [38]; CJ § 5–639 (establishing immunity for owners of "emergency vehicles" providing "emergency service" and creating exception related to motor vehicle insurance limits).[39]

It is quite evident that the Fire and Rescue Act was meant to complement or replicate governmental immunity—an immunity that at least some believed that volunteer fire companies and similar entities had already enjoyed. Even the Court of Special Appeals in its *Utica Mutual* decision had not ruled out the application of official immunity to volunteer fire departments—it simply found that there was insufficient evidence in that case to establish the governmental nature of the volunteer fire department in question and also held that the volunteer firefighters did not qualify as public officials entitled to immunity.

---

**36.** This provision, which used language similar to the Fire and Rescue Act, preceded the latter statute by four years. Chapter 645, Laws of Maryland 1979.

**37.** This provision, which is similar to subsection (b) of the Fire and Rescue Act, preceded the latter statute by two years. Chapter 250, Laws of Maryland 1981.

**38.** This provision, which also used language similar to the Fire and Rescue Act, preceded the latter statute by one year. Chapter 865, Laws of Maryland 1982.

**39.** This provision was enacted the same year as the Fire and Rescue Act. Chapter 539, Laws of Maryland 1983. While the immunity provided by this statute was not necessarily limited to governmental entities, it was limited to acts or omissions during defined emergency situations.

*"Rescue Company"*

The term "rescue" generally connotes a crisis or emergency. A "rescue company" is presumably engaged in activities that alleviate a crisis or emergency. *See Krieger v. Bethesda–Chevy Chase Rescue Squad, supra,* 599 F.Supp. at 772–73 (describing local rescue squad providing "rescue, ambulance, fire-fighting support, and emergency medical services" that "shows up primarily to care for, rescue and transport the injured"). There are a number of entities in Maryland, generally in rural areas, that refer to themselves as a "rescue squad" or "rescue company," and that operate ambulances that respond to emergency situations.[40]

Other parts of the Maryland Code suggest that the phrases "rescue company" or "rescue squad" typically refer to entities that (even if formally private) perform a public function in responding to crises or emergencies and would not normally include a commercial ambulance transport company. For example, "rescue squads" are authorized to enter into mutual aid agreements with contiguous states or similar entities in those states, as well as with the federal government. Maryland Code, Public Safety Article ("PS"), §§ 7–101(b), 7–103 (authorizing such agreements by a "fire, rescue, or emergency medical services entity" which, by definition, include "rescue squads").[41] Such mutual aid agreements contemplate plans to share equipment, personnel, and services necessary to respond to fires and other emergency situations. PS § 7–101(c).

---

**40.** *See* Kent–Queen Anne's Rescue Squad (*www.kentrescuesquad.com* ), Prince Frederick Volunteer Rescue Squad (*www.pfvrs.org/content/history/*), Charles County Volunteer Rescue Squad (*www.ccvrs.org/*), Ridge Volunteer Rescue Squad, St. Mary's County (*www.ridgevrs.org*), Lexington Park Volunteer Rescue Squad (*www.lpvrs.org/content/history/*), Bethesda–Chevy Chase Rescue Squad (*www.bccrs.org/about/index.html*), Wheaton Volunteer Rescue Squad (*www.wvrs.org/about-2*).

**41.** PS § 7–101(b) defines a "fire, rescue, or emergency medical services entity" as a "(1) a governmental subdivision, by its appropriate designated authority; (2) a board or fire commission of a fire department or governmental subdivision; (3) a fire department; (4) a fire company; (5) a rescue squad; or (6) an emergency medical services unit, including an entity that provides emergency medical services at any level."

Moreover, "necessary expenditures" arising out of such agreements are to be "made out of any appropriations usually available" to the entity.[42] PS § 7–107.

*Whether a commercial ambulance company may be a "rescue company"*

TransCare is a commercial ambulance company. According to the testimony of one of its employees, its business generally involves transporting patients from nursing homes to hospitals, from home to a dialysis center, or "wherever the patient needs to go, they take them."[43] It became involved in the transport of Bryson Murray in this case as a result of its contract with UMMS to provide ground transportation services between area hospitals for UMMS patients.

Commercial ambulance companies in Maryland are licensed and regulated by the Maryland Institute for Emergency Medical Services Systems ("MIEMSS"). Maryland Code, Education Article ("ED"), § 13–515. There is no mention in the statute of a licensing requirement for "rescue companies" or "rescue squads." Rather, specifically excepted from this regulation are ambulance services provided by, or operated under, the jurisdiction of State or local government or volunteer fire or rescue companies. ED § 13–515(a)(3)(ii); COMAR 30.09.03.04.[44] In parsing the jurisdiction of MIEMSS over

---

**42.** State law makes provision for the appropriation of State and county funds to support fire and rescue companies. *See* PS § 8–101 *et seq.* (establishing Senator William H. Amoss Fire, Rescue, and Ambulance Fund and providing for distribution of funds to "fire, rescue, and ambulance companies" for specified purposes); *see also* PS § 8–201 *et seq.* (establishing Volunteer Company Assistance Fund to provide grants and loans "to ensure adequate fire protection and rescue services in the State"); PS § 8–301 *et seq.* (authorization of county loans and grants to volunteer fire companies).

**43.** Deposition testimony of Christopher Ryan Barbour at pp. 13–14, submitted as an exhibit to TransCare's Motion for Summary Judgment.

**44.** The statute provides that the phrase "ambulance service" does not include "the transporting of individuals in an ambulance owned, operated, or under the jurisdiction of a unit of State government, a political subdivision of the State, or a volunteer fire company or volunteer rescue squad." ED § 13–515(a)(3); *see also* COMAR

commercial ambulance services under this regulatory regime, the Attorney General noted that "nearly all *commercial* ambulance transports are considered non-emergency." 80 *Opinions of the Attorney General* 118, 120 (1995) (emphasis in original).

It is also notable that the statute governing commercial ambulance companies requires that each company maintain commercial general liability insurance coverage in the amount of at least $1 million—in addition to motor vehicle insurance and other insurance—to provide payment for bodily injuries, death, and property damage "resulting from any cause for which the commercial ambulance service is liable." ED § 13–515(d)(2); *see also* COMAR 30.09.04.06B. It is not clear why a commercial ambulance company would be required to maintain such coverage if it automatically enjoyed general immunity "from civil liability for any act or omission in the course of performing [its] duties."

TransCare asserts that, as an ambulance company that may provide emergency medical services, it necessarily qualifies as a "rescue company" and that it is therefore entitled to the broad, governmental-type immunity provided by the Fire and Rescue Act for "any act or omission in the course of performing their duties." Under this view, TransCare and its employees would apparently enjoy this broad immunity from liability for ordinary negligence in their normal commercial activities, with a limited exception related to motor vehicles. Indeed, the breadth of its immunity would exceed that of State or local agencies, for which the Legislature has enacted limited waivers of sovereign immunity for ordinary negligence that are not restricted to automobile accidents. We are loath to infer, in

---

30.09.01.02B(13)(b) (a "commercial ambulance service" under the regulations does not include "transporting individuals in an ambulance owned by, operated by, or under jurisdiction of a unit of State government, a political subdivision of the State, a volunteer fire company, a volunteer ambulance company, or a volunteer rescue squad or other jurisdictional EMS operations program recognized by the EMS board").

the absence of a clearer statement of legislative intent, that the General Assembly meant to bestow such a benefit on a commercial enterprise generally.

This is not to say that a commercial ambulance company may not qualify as a "rescue company" in particular circumstances. Unlike the Good Samaritan Act, the Fire and Rescue Act is not limited to "volunteer" entities. For example, one might imagine a situation in which a local government has privatized emergency services or has otherwise enlisted commercial entities as first responders.[45]

In this case, the Circuit Court held that TransCare qualified as a "rescue company" without any evidence that the company provides such emergency services in Maryland or that it was functioning as a first responder in the particular circumstances of this case. Indeed, the evidence available to the Circuit Court indicated that TransCare's employee was present for training purposes related to its contract to provide inter-facility transports for UMMS patients. Accordingly, it was an error to grant TransCare's motion for summary judgment on the basis of the Fire and Rescue Act.

While we agree with the Court of Special Appeals that the Circuit Court's decision should be reversed, unlike the intermediate appellate court,[46] we do not rule out the possibility that a commercial ambulance company could establish that it performs the function of a "rescue company." Thus, if a commercial ambulance company like TransCare could demonstrate, on the basis of undisputed facts, that it functioned as a rescue company in particular circumstances, it would be entitled to summary judgment under the Act. Of course, we express no opinion on whether TransCare will be able to do so.

---

45. For example, TransCare's website indicates that it provides 911 services in New York City and other localities. *See* <transcare.com/Home–Services–911EMS.html>.

46. 203 Md.App. at 224, 37 A.3d 987 ("a private commercial ambulance company is not, by definition, a fire or rescue company ...").

### Conclusion

For the reasons stated above, a commercial ambulance company such as TransCare does not qualify for immunity under the Good Samaritan Act, regardless of whether the company's employee may qualify for immunity under the statute. Moreover, in the circumstances of this case, Trans-Care has not demonstrated it functioned as a "rescue company" that has the broad immunity from liability provided by the Fire and Rescue Act. Accordingly, TransCare was not entitled to summary judgment on the basis of statutory immunity.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.